UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————— x
                                              :
YORKSHIRE TOWERS COMPANY L.P., *et*      :    11 CIV 1058 (TPG)
*ano.*                                        :
                                              :
                         *Plaintiffs*,        :
                                              :
          - against -                         :
                                              :
UNITED STATES DEPARTMENT OF              :
TRANSPORTATION, *et al.*,                     :
                                              :
                         *Defendants*.        :
                                              :
——————————————————————— x


## MEMORANDUM OF LAW IN SUPPORT OF
## MTA DEFENDANTS' MOTION TO DISMISS


Bryan Cave LLP
1290 Avenue of the Americas
New York, New York  10104
*Attorneys for Defendants Metropolitan
Transportation Authority, Jay H. Walder in his
capacity as its Chairman, New York City Transit
Authority, Thomas F. Prendergast in his capacity as
its President, Metropolitan Transportation
Authority Capital Construction Company, and
Michael Horodniceanu in his capacity as its
President*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

FACTUAL STATEMENT ...................................................................................... 2

    A.    The Final Environmental Impact Statement and Record of Decision Were Issued in 2004. ................................................................................3

    B.    After Publication of the FEIS, MTA Identified Construction Difficulties with the Originally Proposed Location of the Entrance to the 86th Street Station. ..........4

    C.    MTA Identified the 86th Street Alternatives. ........................................4

    D.    The Alternative 7 Escalators Will Be Located in the Sidewalk in Front of Plaintiffs' Building................................................................................6

    E.    The SEA Assessed the Environmental Impacts of the Proposed New 86th Street Subway Entrance Location. ..........................................................6

    F.    MTA Explained the Basis for Selecting Alternative 7 as the Preferred Alternative................................................................................8

    G.    MTA Engaged in Extensive Public Outreach as to the Change in the Design of the 86th Street Subway Station.......................................................9

    H.    FTA Issued the FONSI on October 29, 2009. ......................................10

    I.    FTA Published Notice of the FONSI on December 9, 2009. ................11

POINT I    PLAINTIFFS' NEPA CLAIM IS BARRED BY THE STATUTE OF LIMITATIONS................................................................................12

POINT II    THE COURT SHOULD DECLINE TO EXERCISE SUPPLEMENTAL JURISDICTION OVER PLAINTIFFS' STATE LAW CLAIMS ........................14

POINT III    PLAINTIFFS' SEQRA CLAIM FAILS TO STATE A CLAIM BECAUSE THE PUBLIC AUTHORITIES LAW EXEMPTS  THE PROJECT FROM SEQRA UNDER THE FACTS PRESENTED HERE AND BECAUSE IT IS BARRED BY THE FOUR-MONTH STATUTE OF LIMITATIONS................................................................................15

POINT IV    PLAINTIFFS' TAXPAYER ACTION UNDER THE GENERAL MUNICIPAL LAW FAILS TO STATE A CLAIM BECAUSE GML § 51 DOES NOT APPLY TO THE DEFENDANTS ....................................................18

CONCLUSION................................................................................ 20

# TABLE OF AUTHORITIES

## CASES

*America Totalisator Co. v. W. Reg'l Off-Track Betting Corp.*, 44 A.D.2d 750, 396 N.Y.S.2d 301 (4th Dep't 1974) ................................................................19

*Carnegie-Mellon University v. Cohill*, 484 U.S. 343 (1988)..........................................14

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002) .......................................2

*Cortec Industrial, Inc. v. Sum Holding L.P.*, 949 F.2d 42 (2d Cir. 1991) ......................2

*Fisher v. Biderman*, 154 A.D.2d 155, 552 N.Y.S.2d 221 (1st Dep't 1990)...................19

*International Audiotext Network, Inc. v. AT&T Co.*, 62 F.3d 69 (2d Cir. 1995)............2

*Klein v. O'Dwyer*, 192 Misc. 421, 80 N.Y.S.2d 343 (Sup. Ct. N.Y. Co. 1948)............19

*Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397 (S.D.N.Y. 2002)..............................2

*Mesivta of Forest Hills Institute, Inc. v. City of New York*, 58 N.Y.2d 1014, 448 N.E.2d 1344 (1983)................................................................................19

*Metropolitan Museum Historic District Coal. v. De Montebello*, 20 A.D.3d 28, 796 N.Y.S.2d 64 (1st Dep't 2005)...............................................................18

*N.Y. Post Corp. v. Moses*, 10 N.Y.2d 199, 176 N.E.2d 709 (1961) ..............................19

*Rapoport v. Asia Electronics Holding Co.*, 88 F. Supp. 2d 179 (S.D.N.Y. 2000).........2

*Riverkeeper, Inc. v. Planning Board of Town of Southeast*, 9 N.Y.3d 219, 881 N.E.2d 172 (2007).................................................................................15

*Save the Pine Bush, Inc. v. City of Albany*, 70 N.Y.2d 193, 512 N.E.2d 526 (1987)...................17

*Seabrook v. Jacobson*, 153 F.3d 70 (2d Cir. 1998)......................................................14

*Stop-The-Barge v. Cahill*, 1 N.Y.3d 218, 803 N.E.2d 361 (2003) ...............................18

*Village of Grand View v. Skinner*, 947 F.2d 651 (2d Cir. 1991) ..................................12

*Young v. Board of Trustees of Village of Blasdell*, 89 N.Y.2d 846, 675 N.E.2d 464 (1996) ........17

## STATUTES

42 U.S.C. § 4332(2) ............................................................................................12

23 C.F.R. §§ 771.130(c), 771.119.............................................................12, 17

23 U.S.C. § 139(l)(1) ..............................................................................1, 11, 12

28 U.S.C. § 1367(c)(3).........................................................................................14

Notice of Limitation on Claims Against Proposed Public Transportation
    Projects, 74 Fed. Reg. 65,203 (Dec. 9, 2009) ..............................................1, 11, 13

## PRELIMINARY STATEMENT

The MTA Defendants[1] respectfully submit this memorandum in support of their motion to dismiss the complaint for failure to state a claim upon which relief can be granted. This lawsuit was filed on February 16, 2011.  Its only federal claim – the allegation brought under the Administrative Procedure Act that defendants' decision not to prepare a Supplemental Environmental Impact Statement ("SEIS") violated the National Environmental Policy Act ("NEPA") – is barred by the 180-day statute of limitations because the lawsuit was not commenced within 180 days of the publication of the notice of defendants' decision in the Federal Register on December 9, 2009.  23 U.S.C. § 139(l)(1); 74 Fed. Reg. 65,203 (Dec. 9, 2009).  This 180-day limitations period expired on June 7, 2010, well prior to the filing of plaintiffs' lawsuit.  Accordingly, the sole federal claim is untimely and should be dismissed with prejudice as against all defendants.  *See* Point I, *infra*.

The court should decline to exercise supplemental jurisdiction over the two state-law claims.  *See* Point II, *infra*.  But if the court accepts jurisdiction, they too should be dismissed with prejudice.  The claim pleaded under the State Environmental Quality Review Act ("SEQRA") fails to state a claim because the Public Authorities Law exempts the Second Avenue Subway project from SEQRA, and, in addition, the claim is barred by the applicable four-month statute of limitations.  *See* Point III, *infra*.  The claim pleaded under the General Municipal Law ("GML") fails to state a claim because the defendants are not municipalities or municipal officers and therefore are not subject to the GML and, in any event, the complaint

---

[1]   The MTA Defendants are Metropolitan Transportation Authority ("MTA"), Jay H. Walder in his capacity as its chairman, the New York City Transit Authority, Thomas F. Prendergast, Jr. in his capacity as its president, the MTA Capital Construction Company and Michael Horodniceanu in his capacity as its president.

does not plead allegations akin to fraud or embezzlement that would establish a predicate for a GML claim even if the defendants were subject to that statute.  *See* Point IV, *infra.*

**FACTUAL STATEMENT**

The facts set forth below are drawn from the complaint and two documents cited in multiple paragraphs of the complaint: (i) the Finding of No Significant Impact issued by the Federal Transit Administration ("FTA") dated October 29, 2009 (the "FONSI") and (ii) the Supplemental Environmental Assessment prepared by MTA and its affiliates dated May 2009 (the "SEA").[2]  These documents, and the associated notice published in the Federal Register, are the exhibits to the declaration of Philip E. Karmel submitted herewith.

The long-awaited Second Avenue Subway project (the "Project") is now under construction.  *See* Complaint ¶ 96.  The first phase of this critically important public works project involves the excavation of tunnels and caverns, and the construction of stations, entrances and ancillary facilities along an alignment running under the Second Avenue corridor from 96th Street to 63rd Street in Manhattan.  *See* SEA at 1-4.  One of the new subway stations to be constructed in this first phase of the Project will be located at 86th Street, a wide and busy cross town thoroughfare with four travel lanes and a mixture of building types, most of which have commercial or retail businesses at the ground-floor level.  *See* SEA at 1-9, 6-14, 6-22.

Plaintiffs seek to prevent MTA from locating two sets of subway station escalators in the sidewalk in front of their building – a huge structure at 305 East 86th Street

---

[2]     These documents may be considered on a motion to dismiss because they are cited in the complaint and are the documents upon which the plaintiffs' claims are founded.  *See* Chambers v. Time Warner, Inc., 282 F.3d 147, 153-54 (2d Cir. 2002); Int'l Audiotext Network, Inc. v. AT&T Co., 62 F.3d 69, 72 (2d Cir. 1995); Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47-48 (2d Cir. 1991); Matusovsky v. Merrill Lynch, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002); Rapoport v. Asia Electronics Holding Co., 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000).

known as "Yorkshire Towers," which sits on the north side of 86th Street between Second and First Avenues.  Complaint ¶ 33; SEA at 6-22.  More particularly, they challenge the FONSI and SEA by which the defendants determined that the escalators would be located on a sidewalk in front of their building, and that this determination did not require an SEIS.  Complaint ¶ 246.

In pleading their claims, plaintiffs let loose a fusillade of allegations purporting to establish the inadequacy of the FONSI and SEA upon which it is based.  This memorandum of law does not address each of these allegations because dismissal is sought on the basis of the statute of limitations and the claims' other legal defects.  Nevertheless, the Court should be aware that there is no basis for plaintiffs' allegations that the FONSI and SEA are substantively deficient.

### A.    The Final Environmental Impact Statement and Record of Decision Were Issued in 2004.

In April 2004, FTA issued a final environmental impact statement ("FEIS") with respect to the construction and operation of the Second Avenue Subway over its full alignment – which will stretch from 125th Street in Harlem to Hanover Square in Lower Manhattan.  *See* FONSI at 2.  The FEIS examined in detail the potential impacts of the Project, both during construction and upon its completion, and identified a series of mitigation measures designed to ameliorate those impacts.  *See* SEA at F-1.  On July 8, 2004, FTA issued a Record of Decision for the Project, based on the findings of the FEIS.  *See* FONSI at 2.

The FEIS identified 86th Street as one of the locations for a subway station, and indicated that one of the entrances to that station was to be located at the northeast corner of Second Avenue and 86th Street, within the Food Emporium supermarket, a street-level commercial tenant of Yorkshire Towers.  *See* Complaint ¶ 30.  However, the analyses presented in the FEIS were based on conceptual and preliminary engineering, *see* FONSI at 2, and the

3

FEIS cautioned that "'[d]etailed designs for [the] stations … will continue to be developed during ongoing engineering.…  [F]inal decisions about the locations of station entrances have not been made.'"  Complaint ¶ 110 (quoting the FEIS).

**B.     After Publication of the FEIS, MTA Identified Construction Difficulties with the Originally Proposed Location of the Entrance to the 86th Street Station.**

As the design for the 86th Street Station progressed and building inspections were performed, MTA engineers found that the proposed northerly entrance to the 86th Street Station in the Food Emporium supermarket presented serious construction difficulties.  *See* SEA at 1-12 to 1-13.  Specifically, after securing access allowing inspection of the ground floor and basement of plaintiffs' building, the engineers determined that the design initially proposed in the FEIS would require: (i) substantial and costly alterations to the Yorkshire Towers building, including underpinning and structural modifications to building columns, beams and possibly apartments above the entrance location; and (ii) closing of the supermarket because of the amount of space required for construction easements.  *See* SEA at 1-12 to 1-13; FONSI at 4.  In an effort to determine whether such complications could reasonably be avoided, MTA began exploring alternatives to the initial entrance design.  *See* SEA at F-2.

**C.     MTA Identified the 86th Street Alternatives.**

In its assessment of alternative entrance locations to the 86th Street subway station, MTA considered the expected ridership at the station, examining, among other things, the volume, origin and destination, and geographic distribution of anticipated customers.  *See* SEA at 1-13 to 1-15.  It found that during the morning peak hour, when the station entrances would be the busiest, 2,900 passengers would enter and 700 passengers would exit using the northern entrances, on average.  Of these, 68 percent would come to or from northeast of the

4

86th Street/Second Avenue intersection, 24 percent to or from the west of Second Avenue, and eight percent from southeast of the intersection. *See* SEA at 1-10.

Next, MTA considered certain "entrance siting requirements," based upon criteria keyed to the size of the facility, its location, constructability and impact on the Project schedule. *See* SEA at 1-15. It also identified the "goals and objectives" to be served in the selection of the location for the entrance, including: (i) improving mobility (achieved by siting the entrance where it would best serve ridership demand and passenger convenience); (ii) minimizing impacts to environmental conditions (among other things, by maintaining pedestrian and traffic flow, minimizing construction impacts and keeping residential and commercial displacement to a minimum); and (iii) minimizing the time and cost of implementation. *See* SEA at 1-15 to 1-16.

MTA then considered seven potential alternatives in light of the goals, objectives and criteria it had identified. In a threshold screening process it eliminated four of these alternatives as being infeasible or incapable of meeting Project requirements. *See* SEA at 2-9 to 2-10, Appendix A; FONSI at 5-6. The alternatives remaining after this initial screening were: Alternative "2," which would involve the location of two pairs of escalators on the south side of 86th Street, east of Second Avenue, and an elevator at the southeast corner of Second Avenue and 86th Street; Alternative "5," which would locate five elevators in a newly constructed building on the southeast corner of Second Avenue and 86th Street; and Alternative "7," which would locate two pairs of escalators on the north side of 86th Street, in front of plaintiffs' building, while maintaining one elevator at the southeast corner of the intersection. *See* SEA at 2-9 to 2-10, 2-12 to 2-15, Figure 2-10, Table 2-2. The SEA identified Alternative "7" as the Preferred Alternative, *see* SEA at 12-5, and it is this alternative that plaintiffs challenge in this litigation.

**D.  The Alternative 7 Escalators Will Be Located in the Sidewalk in front of Plaintiffs' Building.**

With Alternative 7, the two escalator entrances will be located on the north side of 86th Street, in the sidewalk area in front of plaintiffs' building.  The westerly facing corner entrance will be located 21 feet from the building line at Second Avenue, in close proximity to the corner of Second Avenue and 86th Street and in front of the Food Emporium supermarket that occupies the street-level corner of plaintiff's building.  *See* FONSI at 2.  This entrance is to the west of the circular driveway in front of plaintiff's building.  *See* SEA Figure 2-10.  The easterly facing entrance will be located to the east of the circular driveway in front of plaintiffs' building.  Id.  Because Alternative 7 will be built in the sidewalk and under 86th Street, no acquisition of buildings, displacement of residents or businesses, temporary closures of businesses or modifications to existing buildings will be required.  *See* SEA at 7-5 to 7-6; FONSI at 10-11.

**E.  The SEA Assessed the Environmental Impacts of the Proposed New 86th Street Subway Entrance Location.**

The analysis presented in the SEA begins with a description of the construction activities associated with each of the three entrance alternatives, as compared to those involved in the "No Action Alternative" of building the entrance in the location described in the FEIS.  *See* SEA at 3-10 to 3-15.  It then presents an "environmental screening analysis," determining that the 86th Street entrance alternatives would have no potential to change the conclusions of the FEIS in areas such as public open space, natural resources, infrastructure and energy, contaminated materials, safety and environmental justice.  *See* SEA at 4-1 to 4-7.  The SEA then drills down into the potential impacts of each of the three entrance alternatives on the relevant environmental areas: transportation (including subway station access, vehicular traffic and parking, surface transit, and pedestrian conditions), social and economic conditions,

displacement and relocation, historic resources, archaeological resources, air quality, and noise and vibration.  *See* SEA at chapters 5-11.

The SEA paid particular attention to the effects of moving the station entrance on pedestrian conditions.  With respect to the Preferred Alternative, the SEA noted that the largest proportion of riders entering the Second Avenue Subway at the 86th Street Station will arrive from the north and east, and that with the Preferred Alternative most riders will not have to cross either 86th Street or Second Avenue to enter the subway.  *See* SEA at 5-25.  Upon construction of the new entrances, the sidewalk width available for pedestrian circulation adjacent to the escalator housing and canopies will be approximately 10 feet.  *See* SEA at 5-24.

The SEA included a quantitative analysis of the pedestrian level of service at the four corners and crosswalks of the intersection of East 86th Street and Second Avenue as well as the affected sidewalk.  *See* SEA Appendix B.  Comparing the levels of service with the Preferred Alternative against the levels expected under the No Action Alternative, the analysis concluded that no significant adverse pedestrian impacts would occur at any of the locations analyzed.  *See* SEA at 5-25.

The SEA addressed squarely a concern that had been raised by the community with respect to the potential for vehicle-pedestrian conflicts at the circular driveway serving the plaintiffs' building.  *See* SEA at 5-26.  It first noted that the relocation of the subway entrance would not change the volume of vehicles entering or exiting this driveway.  It then observed that in the No Action Alternative, pedestrians traveling to the subway entrance on the northeast corner of the Second Avenue/86[th] Street intersection would cross the plaintiffs' driveway curb cuts, but that many of these pedestrian curb-cut crossings would be eliminated by the Preferred Alternative, since the easterly entrance to the station would be located to the east of the

driveway.  *See* SEA Figure 2-10 (Street Level Plan).  Thus, the SEA concluded that the Preferred

Alternative would improve pedestrian safety at plaintiffs' circular driveway as compared to the

No Action Alternative.  *See* SEA at 5-26.

The SEA also delved into the effect of the Preferred Alternative on neighborhood

character.  It described the escalator entrances in some detail, noting they have been designed

with a minimal footprint and transparent canopy so as to be "least intrusive visually to the

surrounding neighborhood context."  SEA at 6-22.  In the analysis, the SEA took account of the

special characteristics of plaintiffs' building, noting that "the center of the building [and its

residential entrance] is set back more than 50 feet from the sidewalk behind a landscaped area

and a U-shaped driveway" and that the "entrances would flank the curved driveway" at a

location with a "plaza-like" character created by the building setback.  Id.  The document also

considered the character of the wide and busy 86th Street, noting that it creates an "urban setting"

where sidewalk subway entrances would not be out of character.  Id.  For these and other reasons

set forth in SEA, the analysis concludes that the new station entrances "would be designed to be

sensitive to the surrounding architectural context, would not substantially affect views in the

area, and would not result in a material change in urban design or neighborhood character."  Id.

### F.    MTA Explained The Basis For Selecting Alternative 7 As The Preferred Alternative.

The SEA discussed several considerations taken into account by MTA in

identifying Alternative 7 as preferable to Alternatives 2 and 5.  For example, it noted that under

Alternative 2 (with escalators located on the southerly side of 86th Street east of Second Avenue),

several buildings along the south side of 86th Street would be blocked during construction.  *See*

SEA at 2-12, 6-16, 12-6.  The buildings would require alteration, and during the estimated eight-

month construction period, the businesses in these buildings would be closed down, and

residents would be displaced.  *See* SEA at 2-12, 6-16, 12-6.  Given ridership patterns, 92 percent

of the passengers using these entrances would have to cross 86th Street or Second Avenue to

enter the station.  *See* SEA at 2-13.

Alternative 5 – an elevator-only entrance – would require the acquisition of two

four-story buildings at the southeast corner of Second Avenue and 86th Street, and the residents

of the buildings' 15 apartments would be displaced.  *See* SEA at 12-6, Table 12-2.  The premises

of two businesses housed in the buildings, including a portion of the Schaller & Webber store, a

long-established German specialty food store that has been in the neighborhood since 1937,

would also be acquired.  *See* SEA at 1-10, 12-6, Table 12-2.  As with Alternative 2, 92 percent of

the passengers using this proposed entrance would have to cross 86th Street or Second Avenue.

*See* SEA at 2-13, 12-7.

The SEA further notes that Alternative 7 could be implemented without any

building alterations, displacement of businesses or residents or long-term effects on retail

businesses along 86th Street.  *See* SEA at 12-6.  It also notes that this alternative, with entrances

on the north side of 86th Street, would be more convenient for the majority of riders, who will

originate from the northeast and be able to reach the station without crossing 86th Street or

Second Avenue.  *See* SEA at 12-7.  For these and other reasons set forth in the SEA, MTA

selected Alternative 7 as the Preferred Alternative.  *See* SEA at 2-14 to 2-15, 12-5 to 12-7.

**G.  MTA Engaged In Extensive Public Outreach As To The Change In The Design of the 86th Street Subway Station.**

Public presentations of the potential alternatives for the 86th Street Station began

almost a year before the SEA was made available for public review.  *See* FONSI Attachment A

at 39-40 (Response 58).  On July 29, 2008, a presentation was made to a public meeting of the

Community Board 8 Second Avenue Subway Task Force regarding potential design

modifications for the 72nd Street and 86th Street Stations and alternatives to be evaluated in the SEA.  Alternatives 2 and 7 were presented at that time.  Id.

More formal public review of the SEA began with its publication and distribution in May 2009.  A *Notice of Availability* and announcement of the public hearing for the SEA were published in *El Diario* on May 31, 2009 and June 1, 2009; in the *New York Post* on June 1, 2009; in the *Daily Challenge* on June 1, 2009; and in *Our Town* on June 4, 2009.  Id.  Copies of the SEA and notice of availability were available for public review at the offices of the MTA (347 Madison Avenue), FTA Region 2 (1 Bowling Green), and Community Board 8 (505 Park Avenue).  Id.  In addition, the SEA and the public hearing notice were available on MTA's website.  Id.

A public hearing was held to receive comments on the SEA on June 18, 2009. *See* FONSI at 6, Attachment A at 40.  The public comment period was originally scheduled to close on June 30, 2009, but in response to public requests, the deadline for submitting public comments was extended to July 31.  Id.  In addition to oral testimony presented at the public hearing, 24 written submissions and numerous letters, postcards and petitions were received.  Id.  Attachment A to the FONSI addressed each substantive comment, including those made by plaintiffs.  *See* FONSI Attachment A at 2-3, 8-9, 14, 18-20, 24-26, 30-31, 33 (acknowledging comments submitted by Yorkshire Towers Tenants Association and Joseph Ceccarelli on behalf of Yorkshire Towers Co., L.P. that are addressed in comment responses 9, 12, 18, 20, 31, 34, 43 and 46).

### H.    FTA Issued the FONSI on October 29, 2009.

On October 29, 2009, based upon the SEA and the response to comments made during the public review process, FTA issued the FONSI, in which it found, among other things, that the Preferred Alternative "will result in no significant impacts on the environment beyond

those identified in the FEIS and ROD." FONSI at 1. In that deliberative document, FTA summarized the purpose and need for the proposed relocation of the entrances, outlined the basic siting requirements for the entrances, and identified the alternatives considered.[3] *See* FONSI at 3-6. Then, drawing on the SEA, FTA summarized the environmental impacts of the Preferred Alternative in each of the relevant areas of environmental concern, and considered such impacts against those of the other alternatives analyzed in the SEA. *See* FONSI at 7-13. FTA thereby provided a reasoned elaboration for its determination that the environmental impacts of the 86th Street Station Preferred Alternative do not present any significant adverse impacts that had not already been addressed in the FEIS, such that further study in an SEIS would be warranted. *See* FONSI at 14.

**I.      FTA Published Notice of the FONSI on December 9, 2009.**

On December 9, 2009, FTA published a notice in the Federal Register announcing final agency determinations for a number of projects, including the Second Avenue Subway. *See* Notice of Limitation on Claims Against Proposed Public Transportation Projects, 74 Fed. Reg. 65,203 (Dec. 9, 2009) (the "FTA Notice"). The Second Avenue Subway actions announced in this notice included "a FONSI signed October 29, 2009" for "design revisions of the northern entrances to the 72nd Street and 86th Street Stations." 74 Fed. Reg. at 65,204. The Federal Register notice stated that, under the applicable statute of limitations, "[a] claim seeking judicial review of the FTA actions announced herein for the listed public transportation projects will be barred unless the claim is filed on or before June 7, 2010." Id. at 65,203; *see also* 23 U.S.C. § 139(l)(1).

_____

[3]      In addition to the SEA-identified alternatives mentioned above, the FONSI considered an alternative proposed by Civitas during the public comment period, but which was determined to be infeasible. *See* FONSI, Attachment A at 9-14 & Figure 1.

**POINT I**

**PLAINTIFFS' NEPA CLAIM IS BARRED BY THE STATUTE OF LIMITATIONS**

Under NEPA, a federal agency such as FTA is required to prepare "a detailed statement … on … the environmental impact of the proposed action."  42 U.S.C. § 4332(2)(C)(i).  It is pursuant to this directive that the FEIS and Record of Decision were prepared for the Project in 2004.  Under the FTA's implementing regulations and applicable caselaw, an Environmental Assessment (such as the SEA here) is one appropriate device to employ when potentially significant changes to the Project have been proposed and warrant environmental study.  *See* 23 C.F.R. §§ 771.130(c), 771.119; Vill. of Grand View v. Skinner, 947 F.2d 651 (2d Cir. 1991).  In the instant case, FTA concluded, in the FONSI and based on the SEA, that the relocation of the subway entrance on 86th Street did not give rise to environmental impacts that warranted further study in an SEIS.  This litigation seeks judicial review of that determination, but it is time barred and thus should be dismissed with prejudice.

The Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users ("SAFETEA-LU") requires that:

> a claim arising under Federal law seeking judicial review of a[n] … approval issued by a Federal agency for a … public transportation capital project shall be barred unless it is filed within 180 days after publication of a notice in the Federal Register announcing that the … approval is final pursuant to the law under which the agency action is taken, unless a shorter time is specified in the Federal law pursuant to which judicial review is allowed.

23 U.S.C. § 139(l)(1).  The plain language of this provision gives those who wish to challenge a federal approval granted for a public transportation capital project such as the Second Avenue Subway a maximum period of 180 days in which to do so.  This period commences upon publication of a Federal Register notice announcing the approval.  Claims asserted after that time "shall be barred" under the statute.

In the instant case, the 180-day limitations period for plaintiffs' NEPA claim began to run on December 9, 2009, when the FTA Notice was published in the Federal Register. In that notice, FTA explained that it was "advising the public of final agency actions subject to Section 139(l)" and that judicial challenges to those actions would be barred unless filed on or before June 7, 2010.  74 Fed. Reg. at 65,203.  FTA also stated that "[t]he purpose of this notice is to announce publicly the environmental decisions by FTA on the subject projects and to activate the limitation on any claims that may challenge these final environmental actions."  Id. at 65,204. One of the actions identified in the FTA Notice was "a FONSI signed October 29, 2009" for "design revisions of the northern entrances to the 72nd Street and 86th Street Stations" of the Second Avenue Subway, as to which the SEA is the "[s]upporting documentation."  Id. Accordingly, under section 139(l), and in accordance with the FTA Notice, the period for challenges to the FONSI expired on June 7, 2010, 180 days after the notice was published.

Plaintiffs delayed until February 16, 2011 – more than eight months after the statute of limitations had expired – before filing this action.  They did so notwithstanding the fact that they were – or should have been – aware that FTA had approved the relocation of the 86th Street station entrances.  Plaintiffs and their counsel participated in the MTA's and FTA's environmental review of the design revisions to the subway entrances by submitting written comments, and residents of Yorkshire Towers spoke at the June 18, 2009 public hearing on the SEA.  *See supra* at 11.  The FTA Notice was published more than six months after issuance of the SEA and more than a month after FTA issued the FONSI.

For these reasons, the plaintiffs' NEPA claim, pleaded as Count I of the complaint, should be dismissed with prejudice.

## POINT II

### THE COURT SHOULD DECLINE TO EXERCISE SUPPLEMENTAL JURISDICTION OVER PLAINTIFFS' STATE LAW CLAIMS

A federal court may decline to exercise supplemental jurisdiction over state law claims if the court has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3). Since plaintiffs' only federal claim is time barred, the Court should decline to exercise jurisdiction over plaintiffs' claims under SEQRA (Count II) and GML § 51 (Count III).

In determining whether to exercise supplemental jurisdiction, federal courts should "consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity." Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988). "When the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." Id. Furthermore, "principles of federalism and comity" may dictate that "novel or unresolved questions of state law, especially where those questions concern the state's interest in the administration of its government," be resolved by state courts. Seabrook v. Jacobson, 153 F.3d 70, 72 (2d Cir. 1998).

Here, declining to exercise jurisdiction over the state law claims at this juncture would be consonant with principles of judicial economy. Moreover, both state law claims concern the administration of state government because they challenge the decisions and decision-making processes of state entities as being in violation of the mandates of state law and as wasting public resources. The SEQRA claim, in particular, involves interpretation of two provisions of the New York Public Authorities Law ("PAL") that create specific exemptions from a generally applicable state environmental review law. See Point III, infra. While the

language of those provisions is clear, state jurisprudence interpreting them is sparse.  Therefore, declining to exercise jurisdiction over the issues raised by plaintiffs' state law claims would serve the interests of federalism and comity.

## POINT III

### PLAINTIFFS' SEQRA CLAIM FAILS TO STATE A CLAIM BECAUSE THE PUBLIC AUTHORITIES LAW EXEMPTS THE PROJECT FROM SEQRA UNDER THE FACTS PRESENTED HERE AND BECAUSE IT IS BARRED BY THE FOUR-MONTH STATUTE OF LIMITATIONS

SEQRA is New York's version of the federal NEPA statute and, in appropriate cases, may require a state agency or municipality to prepare an environmental impact statement, or a supplemental environmental impact statement.  *See* Riverkeeper, Inc. v. Planning Bd. of Town of Southeast, 9 N.Y.3d 219, 231-32, 881 N.E.2d 172, 176-77 (2007) (discussing standard for preparing an SEIS under SEQRA).  Here, however, the requirements of SEQRA do not apply to the Project because section 1266-c of the Public Authorities Law  excludes from SEQRA review "transit projects" that require preparation of an environmental impact statement ("EIS") under NEPA.

In particular, section 1266-c provides:

Nor shall *any transit project* or any acts or activities in connection therewith taken by any person or entity, public or private, pursuant to this section be subject to the provisions of [SEQRA] if *such project*, acts or activities require the preparation of a statement under or pursuant to any federal law or regulation as to the environmental impact thereof.

PAL § 1266-c(11) (emphasis added).

There can be no doubt that the Project is a "transit project" within the meaning of section 1266-c because it involves the construction of a "transit facility," a term defined as a "rapid transit railroad, omnibus line or any other facility or any railroad in the city used for local service in the transportation of passengers."  PAL §§ 1200(15), 1261(20).

Nor can there be doubt that the "transit project" covered by section 1266-c is the Project in its entirety, including each of its component parts.  Thus, a "transit facility" includes "any portion thereof … , together with the devices and appurtenances, facilities and equipment thereof and power plants and other instrumentalities used or useful therefor or in connection therewith."  PAL § 1200(15); *see also* PAL § 1200(6) (defining "devices and appurtenances" to include "the number, location, description and plans and specifications for … stations, … structures, platforms, stairways, elevators, telephone, telegraph and signal devices, facilities for access to the surface").  Thus, the Project, consisting of all its components (including but not limited to its station entrances) is a "transit project" within the meaning of the PAL.  Moreover, the Project "require[d] the preparation of [an EIS] under … federal law or regulation," PAL § 1266-c(11), and that document was duly prepared and issued in 2004.  *See supra* at 3.  As a result, it is clear that the Project – in its entirety – is exempt from SEQRA under PAL § 1266-c.

Similarly, section 1266(11) of the PAL excludes from SEQRA "any acts or activities taken or proposed to be taken by [MTA] in connection with the planning, design … [or] construction … of a transportation facility" if such acts or activities require that a federal EIS be prepared.  The Project is a "transportation facility" within the meaning of section 1266(11) because that term is defined to include "transit [or] railroad … facility" and "stations and other related facilities."  PAL § 1261(17).  This separate and distinct statutory exemption precludes plaintiffs' SEQRA claim since: (i) the Project consists of "acts or activities" taken by MTA and its subsidiaries in connection with the planning and construction of a transportation facility; and (ii) those acts and activities required preparation of a federal EIS.

Thus, two separate provisions of state law exempt the Project from SEQRA and place its environmental review in the hands of the lead federal agency (the FTA).  Nor did these

16

statutory exemptions from SEQRA disappear simply because the Project design was refined

subsequent to the issuance of the FEIS.  As noted above, the FEIS gave clear notice that the

station entrances it had identified could be relocated.  *See supra* at 4.  Since the Public

Authorities Law is explicit that it is federal, rather than state law, that governs the environmental

review of the Project, it was up to FTA, as lead federal agency, to determine whether the

environmental impacts of the 86th Street station entrance relocation warranted further study in an

SEIS.  *See* 23 C.F.R. § 771.130.  To conclude otherwise would require state agencies such as

MTA to second-guess the lead agency as to whether modifications to projects previously

considered in a federal EIS require additional environmental review and would subvert the

statutory exemptions in the PAL.  This is particularly so under circumstances where, as here, the

federal agency specifically determined that the modifications at issue did not warrant an SEIS.

In such circumstances, it would be contrary to the plain language and intent of the PAL

exemptions for a court to require an SEIS under SEQRA when the lead federal agency

determined not to require one under NEPA.

        In any event, the SEQRA claim is time barred for essentially the same reasons as

the NEPA claim.  The SEQRA claim is subject to a four-month statute of limitations period, *see*

CPLR § 217(1); Save the Pine Bush, Inc. v. City of Albany, 70 N.Y.2d 193, 203, 512 N.E.2d

526, 529 (1987), which is even shorter than the 180-day period applicable to the NEPA claim.

Plaintiffs failed to commence this proceeding within four months after MTA selected the

Preferred Alternative in its SEA and the FTA approved that determination in the FONSI on

October 29, 2009, at which point it became final and binding, starting the clock on the four-

month limitations period.  *See* Young v. Bd. of Trustees of Vill. of Blasdell, 89 N.Y.2d 846, 848-

49, 675 N.E.2d 464, 466 (1996); *see also* <u>Stop-The-Barge v. Cahill</u>, 1 N.Y.3d 218, 223-24, 803

N.E.2d 361, 363-64 (2003).  Thus, plaintiffs' SEQRA claim is time barred.

Even if the statute of limitations were deemed to run from FTA's publication of

the notice in the Federal Register on December 9, 2009, the time for filing a SEQRA claim

would have expired on April 9, 2010, over 10 months before plaintiffs filed this action.  *See*

<u>Stop-The-Barge</u>, 1 N.Y.3d at 223-24, 803 N.E.2d at 363-64; <u>Metro. Museum Historic Dist. Coal.</u>

<u>v. De Montebello</u>, 20 A.D.3d 28, 35, 796 N.Y.S.2d 64, 69-70 (1st Dep't 2005), *aff'g* Index No.

119635/03, 2004 WL 1326706, at *8-9 (Sup. Ct. N.Y. Co. May 14, 2004).

For these reasons, plaintiffs' SEQRA claim should be dismissed with prejudice.

## POINT IV

### PLAINTIFFS' TAXPAYER ACTION UNDER THE GENERAL MUNICIPAL LAW FAILS TO STATE A CLAIM BECAUSE GML § 51 DOES NOT APPLY TO THE DEFENDANTS

Plaintiffs allege in Count III that defendants' actions approving modifications to

the 86th Street station entrances "amount[] to official illegal or bad faith acts causing waste of

public property and taxpayer monies within the meaning of N.Y. Gen. Mun. Law § 51."

Complaint ¶ 272.  But section 51 of the GML does not apply to defendants, who are state and

federal entities (or officials of state and federal entities).  Plaintiffs' GML § 51 taxpayer action

therefore fails to state a claim upon which relief can be granted.

GML § 51 provides for a right of action against "[a]ll officers, agents,

commissioners and other persons acting, or who have acted, for and on behalf of *any county,*

*town, village or municipal corporation in this state*."  GML § 51 (emphasis added).  None of the

defendants falls into any these categories.  The United States Department of Transportation,

FTA, the Secretary of Transportation and the FTA Administrator are federal entities or officials

that may not be sued under GML § 51.  MTA and the New York City Transit Authority are state

public benefit corporations, and the MTA Capital Construction Company is a subsidiary of MTA.  *See* PAL §§ 1201, 1263; Complaint ¶¶ 42, 45, 47.  The individual MTA Defendants are officials of these entities.  *See* Complaint ¶¶ 43, 46, 48.  As state instrumentalities and the representatives of such entities, the MTA Defendants are also not subject to suit under GML § 51.  *See* N.Y. Post Corp. v. Moses, 10 N.Y.2d 199, 204, 176 N.E.2d 709, 711 (1961) (GML § 51 has been "clearly construed as not giving a right of action against officers or agents of the State" (citing cases)); Am. Totalisator Co. v. W. Reg'l Off-Track Betting Corp., 44 A.D.2d 750, 396 N.Y.S.2d 301 (4th Dep't 1974) ("WROTB, being a public benefit corporation, is not subject to the provisions of section 51 of the General Municipal Law permitting actions by taxpayers against municipalities." (citations omitted)); Klein v. O'Dwyer, 192 Misc. 421, 426, 80 N.Y.S.2d 343, 348 (Sup. Ct. N.Y. Co. 1948) (no taxpayer's action lies against "a State instrumentality, carrying on a State function").

Since none of the defendants is covered by GML § 51, plaintiffs' claim under this statute should be dismissed with prejudice.  Moreover, GML § 51 has an extremely high standard of pleading and proof akin to fraud and embezzlement.  *See, e.g.*, Mesivta of Forest Hills Inst., Inc. v. City of New York, 58 N.Y.2d 1014, 1016, 448 N.E.2d 1344, 1345 (1983) ("a taxpayer action pursuant to section 51 of the General Municipal Law lies 'only when the acts complained of are fraudulent, or a waste of public property in the sense that they represent a use of public property or funds for entirely illegal purposes'" (citation omitted)); Fisher v. Biderman, 154 A.D.2d 155, 159, 552 N.Y.S.2d 221, 224 (1st Dep't 1990).  The provision is not a catch-all cause of action to sue agencies for allegedly arbitrary or unlawful conduct and would be inapplicable here even if the defendants were municipalities or municipal officials subject to the law.

For these reasons, the GML claim should also be dismissed with prejudice.

## CONCLUSION

The MTA Defendants' motion should be granted, and judgment should be entered dismissing this action with prejudice.

Dated: New York, New York
   September 1, 2011

     Respectfully submitted,

     BRYAN CAVE LLP

     By: *Philip E. Karmel*

      Philip E. Karmel (pekarmel@bryancave.com)
      J. Kevin Healy (jkhealy@bryancave.com)
     1290 Avenue of the Americas
     New York, New York  10104
     Telephone: 212-541-2000
     *Attorneys for Defendants Metropolitan*
     *Transportation Authority, Jay H. Walder in his*
     *capacity as its Chairman, New York City Transit*
     *Authority, Thomas F. Prendergast in his capacity as*
     *its President, Metropolitan Transportation*
     *Authority Capital Construction Company, and*
     *Michael Horodniceanu in his capacity as its*
     *President*