UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x
YORKSHIRE TOWERS COMPANY, L.P. and
YORKSHIRE TOWERS TENANTS ASSOCIATION,

**Case No. 11-cv- 1058 (TPG)**

                              Plaintiffs,

          -against-

UNITED STATES DEPARTMENT OF
TRANSPORTATION *et al.*
                              Defendants.
--------------------------------------------------------------------x

YORKSHIRE TOWERS COMPANY, L.P. and          **Case No. 10-cv-8973 (TPG)**
YORKSHIRE TOWERS TENANTS ASSOCIATION,

                              Plaintiffs,

          -against-

THE FEDERAL TRANSIT ADMINISTRATION, *et al.*
                              Defendants.
--------------------------------------------------------------------x


**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION**


                                        **ANDERSON KILL & OLICK, P.C.**

                                        1251 Avenue of the Americas
                                        New York, New York  10020

                                        **CECCARELLI WEPRIN PLLC**

                                        Two Wall Street
                                        New York, New York  10005-2008

                                        Attorneys for Plaintiffs
                                        *Yorkshire Towers Company, L.P. and
                                        Yorkshire Towers Tenants Association*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF RELEVANT FACTS ......................................................................... 4

    Edward I. Cohen ........................................................................................................ 5

    Doron Gopstein......................................................................................................... 7

    Jerome M. Lutin........................................................................................................ 8

    Ernest Conrad .......................................................................................................... 9

ARGUMENT ................................................................................................................. 10

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS........................... 10

II.   IRREPARABLE INJURY AND BALANCING THE EQUITIES ....................... 11

III.  INJUNCTIVE RELIEF MAY BE GRANTED IN SUPPORT OF PLAINTIFFS'
      SEQRA AND MISAPPLICATION OF PUBLIC FUNDS CLAIMS .................................. 13

    A.    SEQRA ......................................................................................................... 13

    B.    Misapplication of Public Funds ....................................................................... 14

CONCLUSION.............................................................................................................. 166

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Amoco Production Co. v. Village of Gambell*,
   480 U.S. 531 (1987)........................................................................................12

*Automobile Club of New York v. Cox*,
   592 F.2d 658,662 (2d Cir. 1979).....................................................................15

*Brodsky v. U.S. Nuclear Regulatory Comm.*,
   ___F.Supp.2d___. 2011 WL 797497 (Mar. 4, 2011).........................................11

*Chester Civil Imp. Ass'n. v. .New York City Transit Authority*,
   122 A.D.2d 715 (1st Dept. 1986).......................................................................16

*Citizens to Preserve Overton Park, Inc., v. Volpe*,
   401 U.S. 402 (1971)........................................................................................12

*Habitat for Horses v. Salazar*,
   745 F.Supp.2d 438 (S.D.N.Y. 2010).................................................................11

*New York v. Shinnecock Indian Nation*,
   523 F.Supp.2d 185 (E.D.N.Y. 2007) ................................................................16

*Save Our Parks v. Kempthorne*,
   2006 WL 3378703 (S.D.N.Y. Nov. 15, 2006) ...................................................15

*Schulz v. State*,
   217 A.D.2d 393 (3rd Dept. 1995) .......................................................................16

*Sierra Club v. U.S. Army Corps of Engineers*,
   701 F.2d 1011 (2d Cir. 1983)............................................................................14

*Steubing v. Brinegar*,
   511 F.2d 489 (2d Cir 1975)...............................................................................12

*Stewart Park & Reserve Coalition, Inc. v. Slater*,
   352 F.3d 545 (2d Cir. 2003)..............................................................................15

*Suffolk v. Secretary of the Interior*,
   562 F.2d 1368 (2d Cir. 1977)............................................................................11

*Village of Westbury v. NYDOT*,
   75 N.Y.2d 62 (1989) .........................................................................................13

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

STATUTES

NEPA ........................................................................................................................... passim

N.Y. General Municipal Law section 51 ....................................................................16

N.Y. Public Authorities Law section 123-b.................................................................16

N.Y. Pub. Auth. Law section 1266-c ..........................................................................15

OTHER AUTHORITIES

40 C.F.R. § 1502.2(f) ...................................................................................................13

Fed. Rules Civ. Proc. Rule 15(b) ................................................................................16

## PRELIMINARY STATEMENT

This memorandum, and the motion it supports, are somewhat unusual. Defendants intend to locate the East 86th street entrances to the Second Avenue Subway ("SAS") in front of Yorkshire Towers, the largest residential rental building that will be directly served by the SAS.  The eastern entrance is slated to go almost precisely in the middle of the block between 2nd and 1st Avenues, just to the east of Yorkshire Towers one branch of the entrance drive.  The western entrance begins 21 feet east of the Yorkshire Towers building line and runs nearly to the other branch of the entrance drive.  The effect is to flank this building, housing over 2000 residents many of them parents with young children or seniors, with what is scheduled to be one of the most heavily congested subway entrances in the City.  Essentially, defendants' "solution" is to isolate Yorkshire Towers between two streams of pedestrian traffic and to make access to Yorkshire Towers difficult and dangerous.

The owner and tenants of that building have banded together with the local elected officials several years ago to attempt to persuade defendants to put the entrances on the corner, where every other entrance to the SAS is going.  When defendants, who had planned a similar midblock entrance at 72nd Street, agreed to move that entrance to the corner, the community and the 86th Street residents thought that the same result would follow for them. Even after the defendants refused to make the change, the community continued to try to make reason prevail.  Finally, the building owners and the tenants sued.  The suit accuses defendants of failing to meet their obligations under NEPA and its state equivalent, in that defendants refused to evaluate the myriad reasons why the residential mid-block entrance alternative is environmentally unsound compared to putting the entrances on the southeast corner, reasons which have been developed over the past year or so by plaintiffs' team of experts.

That suit was brought in February of 2011, after defendants, spurred by a companion lawsuit seeking compliance with the freedom of information laws, finally made partial disclosures that demonstrated the many areas where defendants had failed in their NEPA obligations.  At that time, no contracts had been let in connection with the 86th Street entrances, and there was no need for any interlocutory relief.  But what happened was that defendants, under this court's compulsion, entered into a settlement process which was predicated on plaintiffs' claim that if the proper analysis of the south east corner alternative were conducted, based on appropriate design, switching the entrance across the street and down the block would become the inevitable correct change, and that retaining the residential mid-block alternative would be demonstrated to be arbitrary, capricious, and just plain wrong.

Negotiations ran through the summer.  To every suggestion from defendants that there were obstacles to shifting to the southeast corner location, plaintiffs provided solutions.  By the end of August, it became common ground that the southeast corner alternative was feasible, and plaintiffs provided massive documentation and plans to establish that choosing that alternative would save costs, would provide superior service, and would be completed well within the allotted time.  By then, defendants had finally signed their first contract involving the 86th Street station, and virtually immediately they rejected the southeast corner alternative, refused to continue any discussions between their technical staffs and plaintiffs' experts, and simply announced that they would not consider any move from the midblock.  They then accelerated the beginning of actual work, provoking the instant motion.

Often in cases involving NEPA, a provisional remedy is sought because old growth timber is going to be sawed down, or roads are going to be cut through a wilderness, or the habitat of an endangered species is threatened.  In all candor, that level of dire emergency is

not now present.  What is proposed is to tear up East 86th Street and the sidewalk in front of Yorkshire Towers, reroute the traffic away from the center lanes of the street, excavate, and lay a new sewer down the middle of 86th Street.  New Yorkers live with that kind of disruption, and were this construction program to be needed this motion would not be made.

But as plaintiffs' extensive expert submissions, submitted in support of the motion, establish, **none of this work need ever be done.**

As plaintiffs have demonstrated in their opposition to defendants' motion to dismiss, defendants have just not evaluated, let alone taken a hard look at, the Reduced Modified Alternative 5 that is so far the superior solution to locating the 86th Street entrances that either defendants will see the wisdom of change, or this court will be compelled to undertake a searching inquiry into the competence and motivation of any evaluation that retains the residential mid-block approach.

Plaintiffs would not press this motion if all that this case were about was titular lack of compliance by defendants with their NEPA obligations.  We are not suing to delay while every jot and title of NEPA review is fully accomplished and documented, only to have the midblock siting eventually pass NEPA muster.  No, what plaintiffs seek, and what plaintiffs can prove, is that the **only** site for the 86th Street entrance that is not arbitrary and capricious is the southeast corner by implementing the design and construction approaches that our experts devised, when defendants couldn't or wouldn't.

For these reasons, the bulk of this memorandum outlines just what plaintiffs experts have presented to enable the 86th Street entrances to be located where they must be, on the southeast corner, and demonstrate that the work currently beginning is, and will ultimately be recognized to be, unnecessary.  As demonstrated in plaintiffs' memorandum in opposition to

defendants' motion to dismiss, it is surely likely that plaintiffs will succeed in compelling defendants to supplement their NEPA analyses at least in regard to the new information that has been developed since the SEA and FONSI were issued.  Here, we detail that this failure to consider the new information was arbitrary and capricious.  We also brief the injury and balancing of equities aspects of this motion.

## STATEMENT OF RELEVANT FACTS

The instant motion seeks to enjoin defendants from tearing up East 86th Street to demolish an old but operational sewer.  There is no reason why this work should be done now, at great disruption to the immediate area and especially to the residents of Yorkshire Towers, because there is no reason why this work ever needs to be done.  As plaintiff's declarations establish, defendants' placement of the 86th Street entrances to the Second Avenue Subway in the middle of the block between Second Avenue and First Avenue, taking up most of the sidewalk in front of Yorkshire Towers, and putting the young and old alike in danger of an errant vehicle or a trampling mob of subway users, is neither well considered nor wise.  These declarations and their supporting exhibits demonstrate that the proper location for the East 86th Street entrances is on the southeast corner, that southeast corner entrances are fully feasible and will enhance passenger flow and increase passenger safety,  and as well prove that destroying the street and sidewalk now or ever is an unnecessary frolic.

To facilitate the Court's review of these points, we here outline in broad strokes the plaintiffs' declarations.[1]

---

[1]     Unless stated otherwise, paragraph references in the remainder of the Statement of Facts refer to the paragraphs of the declarations of the declarant under discussion.

**Edward I. Cohen**

Ed Cohen is the captain of the team of experts that plaintiffs hired when it became apparent that defendants had no genuine interest in trying to meet the fully legitimate concerns of the Upper East Side Community over a set of subway entrances restricting the sidewalk in front of Yorkshire Towers. When he worked for the MTA, Mr. Cohen was himself the lead architect for the planning and preliminary design of the SAS entrances, and of the Design Guidelines that the MTA kept from the public until forced to divulge them by plaintiffs' Freedom of Information suit. ¶s 1-6

When the original planned entrance within the supermarket currently occupying the north-east corner of 86th Street and 2nd avenue proved to be unbuildable, defendants considered alternatives. Defendants' analysis of the alternatives it came up with is found in the Supplemental Environmental Assessment of 2009, ("SEA"). Once Mr. Cohen looked at that document and the plans supposedly supporting it, he swiftly concluded that of the three "build" alternatives for the 86th Street entrance that were considered, only the southeast corner, denominated in the SEA "Alternative 5", was in conformity with the Design Guidelines. The "Preferred Alternative", which runs 270 feet along the north side of 86th Street, doesn't pass muster under the Design Guidelines. ¶s 7 – 9.

Even were one to ignore the Design Guidelines, the "Preferred Alternative", allegedly selected by defendants because of its superior passenger convenience, fails its own self-defined test. A properly designed southeast corner entrance, which as noted below is precisely what plaintiffs have provided to defendants, actually moves passengers to and from the subway turnstiles faster than does the "Preferred Alternative." And as Mr. Cohen trenchantly observes, if under the "Preferred Alternative" it is acceptable to force the disabled to cross to the south side of 86th Street, to supposedly favor the able-bodied by giving them access system on

the north side of 86th Street is discriminatory and illogical. ¶s 11 - 13, and see discussion of the Lutin declaration below.

Perhaps the most significant contribution of Mr. Cohen and his team to the present litigation is their design, completely at the cost of plaintiffs, of the "Reduced Alternative Five". In a sentence, the plaintiffs' team designed the correct southeast corner entrance system that defendants, with their years of cogitation and hordes of engineers and other experts, never worked out for themselves.  The correct southeast corner entrance fits within a single corner lot, with the placement of a set of emergency egress stairs under the southeast corner sidewalk, matching the northeast corner stair placement of the "Preferred Alternative."  As Mr. Cohen puts it, "If that solution works once, it works twice."  And further, it turns out that a second set of egress stairs is not required by code once one adopts the five elevator solution of Revised Alternative 5.  ¶s 16 – 18, and see discussion of the Conrad declaration below.

Mr. Cohen goes on to set out the reasons why Reduced Alternative 5 is so superior to the "Preferred Alternative" as to make the selection of the north side mid-block location arbitrary and capricious.

- There will be less community disruption during construction.  ¶s 21 – 23.

- Reduced Alternative 5 enhances passenger convenience, reliability, safety, and security.  ¶ 24.

- Reduced Alternative 5 has very significant cost savings, both during construction and during operation.  ¶s 25 – 26.

Mr. Cohen then demonstrates why the preliminary injunction ought to issue.  In short, the current work, which involves the disembowelment of a sewer and its temporary replacement for three years of subway entrance construction, is just unnecessary once the

southeast corner solution is adopted.  Whether  the "Preferred Alternative" is abandoned because defendants upon reflection and proper environmental review adopt the clearly superior southeast corner solution, or because this Court ultimately finds that the "Preferred Alternative" fails the arbitrary and capricious test, no new sewer ever needs to be constructed in 86th Street.  And even were a north side alternative to be permitted to go forward, there is no reason other than a blatant attempt by defendants to change the facts on the ground during litigation to accelerate by some 6 months the disruption that defendants are in the process of causing.  ¶s 27 – 38.

### Doron Gopstein

Doron Gopstein is the President of Yorkshire Towers Tenants' Association, one of the plaintiffs in these related cases.  In his declaration, he points out the interest of the residents of Yorkshire Towers in preserving their "front yard," ¶3, and details the frustration the tenants have experienced in getting any useful information from defendants as to why their "front yard" needs to be decimated, their tranquility disturbed by a phalanx of subway users, and the safety of their children, their senior citizens, and the subway passengers themselves  put at risk by the ill-considered siting of the subways entrances in the middle of a residential block.  ¶s 4 – 10.

Mr. Gopstein emphasizes that defendants hiding for years their own Design Guidelines, with their dispositive preference for corner subway entrances wherever feasible, is precisely the precipitating factor in the timing of the instant litigation.  ¶s 11 – 17.  Defendants also have, to this day, remained peculiarly closed-mouthed about the specific cost and technical information that supposedly backs up their preferring a residential mid-block entrance – unique in the Second Avenue Subway universe – over the corner entrance called for by the Design Guidelines.  This silence has been maintained despite specific requests from the local elected

officials, the Community Board, and the Yorkshire Tower tenants for this essential information. ¶s 18 - 24.

The thrust of Mr. Gopstein's submission is to establish that the new information which enabled Mr. Cohen and his team to devise Reduced Alternative 5 was either not available when the SEA and FONSI were issued or was kept from the public, in violation of the underlying purpose of NEPA to provide a transparent decision making process. ¶s 26 - 27.

**Jerome M. Lutin**

Mr. Lutin is an expert in transportation planning. ¶s 2 – 3. His particular contribution to Reduced Alternative 5 was in the area of passenger movement and timing. His declaration serves to introduce three reports, on passenger convenience, the superiority of the Reduced Alternative 5 elevator solution over the "Preferred Alternative's" dependence on escalators, and the matching by Reduced Alternative 5 of the queuing levels and pedestrian flows that defendants consider adequate in their midblock escalator alternative..

Mr. Lutin's studies establish that the five elevator solution, which markedly increases public safety in hypothetical emergencies, also provided better services both for the disabled and the able-bodied than does the "Preferred Alternative." He also conclusively refutes defendants' contention, made repeatedly since this case was brought and Reduced Alternative 5 was created, that moving away from mid-block would increase subway user access times, cause pedestrian congestion, and not meet required queuing levels of service. Mr. Lutin proves that creating Reduced Alternative 5, with its minimal disruptions and use of existing space compared to defendants' musings about a southeast corner entrance, actually provides the same or better access times and crowd ameliorations than does the "Preferred Alternative."

**Ernest Conrad**

Mr. Conrad contributed his expertise, ¶2, to the plaintiffs' team in the area of fire code compliance.  He demonstrates that under the 2010 revisions to the National Fire Protection Association 130 Standards for Transit and Railway systems, emergency elevator egress is "more realistic" for deep stations than the escalator systems previously recommended.  He states that "Reduced Alternative 5 offers a better and improved public safety alternative" than does the defendants' preferred alternative, which calls for escalators.  ¶ 5.  He goes on to establish that the Reduced Alternative 5 elevator system "makes this the far more preferable 'build' alternative from a public safety point of view. ¶7.  He details the specific safety features provided by Reduced Alternative 5, ¶s 8 – 13.

Mr. Conrad then turns to the emergency egress stairs question which underpins defendants' insistence that they must remove the existing sewer under East 86th Street.  Reduced Alternative 5 obviates the need for a second set of egress stairs on the south side of 86th Street, to complement the egress stairs that under either Reduced Alternative 5 or the "Preferred Alternative" will be built under the sidewalk at the northwest corner of 86th Street and second avenue.  This is due to the fact that under the 2010 NFPA Code the five high speed, generator-powered elevators called for by Reduced Alternative 5 count as 50% of the required emergency egress, with the remaining 50% coming from the northwest corner stairs.  ¶s 16 – 18.

Mr. Conrad thus demonstrates that the "Preferred Alternative" is inferior from a public safety standpoint to Reduced Alternative 5 – and not incidently demonstrates as well that the 2010 Code is new information not considered by defendants when they issued the SEA and the FONSI.

## ARGUMENT

## I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

As Plaintiffs have briefed extensively in their Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Initial MOL"), at pages 4 – 11, the failure – or rather the refusal – of defendants to even prepare an environmental assessment of the Reduced Alternative 5 violated NEPA.  In brief, the operative rule is that

> Courts are not to substitute their judgment of the environmental impact for the judgment of the agency, **once the agency has adequately studied the issue**.  However, courts should determine whether the agency has, in fact adequately studied the issue and taken a "hard look" at the environmental consequences of its decision.  *Brodsky v. U.S. Nuclear Regulatory Comm.*, ___F.Supp.2d___. 2011 WL 797497, *11 (Mar. 4, 2011)(emphasis added, internal cites omitted).

Here, plaintiffs submit, it is incontestable that defendants have not "adequately studied the issue" of placing the 86th Street entrances at the southeast corner on a single building lot.  Defendants never came up with this solution on their own, and have rejected plaintiffs' solution without analysis or study.  Not because plaintiffs' solution isn't feasible, let alone far better, but, apparently, just because defendants didn't think of it themselves.

Under the cases, the choice to decide what requires an "adequate study" is itself reviewable under an arbitrary and capricious standard.  *Habitat for Horses v. Salazar*, 745 F.Supp.2d 438, 455 (S.D.N.Y. 2010).  Where a new solution to an unstudied problem is provided precisely in response to the determination of the agency that the time for studying is over -- which is what plaintiffs have done here – the agency cannot simply "sweep stubborn problems or serious criticism … under the rug." *Suffolk v. Secretary of the Interior*, 562 F.2d 1368, 1384 (2d Cir. 1977).

Once defendants "[rigorously explore and objectively evaluate all reasonable alternatives," as they are required to do under the regulations implementing NEPA , see Initial MOL at 11, acting in good faith they will be unable to conclude anything other than that the southeast corner is both feasible and preferable.  For beyond procedural compliance, an agency decision that brings with it environmental impacts is arbitrary and capricious if it is the result of a "clear error of judgment." *Citizens to Preserve Overton Park, Inc., v. Volpe*, 401 U.S. 402, 416 (1971).  Building the entrances on the north sidewalk mid-block, in front of Yorkshire Towers, rather than building them in the southeast corner lot would be precisely such an error.

## II.    IRREPARABLE INJURY AND BALANCING THE EQUITIES

Unless a statute specifically requires that an injunction issue upon a finding of a violation, the district court should employ traditional equitable principles, including an assessment of the likelihood of irreparable harm to the moving party, in deciding whether to issue a preliminary injunction. *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531 (1987).  If construction is likely to harm the environment during the pendency of the agency action "the balance of harms will usually favor issuance of an injunction" since such harm can rarely be remedied by money damages. *Amoco*, 480 U.S. at 545.

The Second Circuit concluded as much in its decision in *Steubing v. Brinegar*, 511 F.2d 489 (2d Cir 1975), reasoning as follows:

> The record also supports the finding of the District Court that there was an adequate showing of probable irreparable injury, where the substructure contract for the bridge was only three percent complete, only one test piling had been completed and the final structure would contain 250 such pilings and stretch over four-fifths of a mile of water.  Id. at 496.  Construction of the bridge would leave a lasting imprint on Lake Chautauqua, which is one of western New York's largest and most beautiful lakes.  Id. at 496.  But given that the bridge is at such a very early state of construction, we believe that the District Court was justified in concluding that substantial environmental damage could or would

result from the bridge, and that construction should not proceed without a more comprehensive environmental study and a more careful consideration of alternatives still open. Id. at 496. Without preliminary injunctive relief construction might well reach the stage of completion where for economic and other reasons it would be impossible to turn back or alter the project in light of what an EIS revealed, and thus the environment might thereby be irreparably damaged. Id. at 497.

Agencies conducting environmental review under Federal law are prohibited from committing resources prejudicing selection of alternatives before making a final decision in violation of 40 C.F.R. § 1502.2(f). If the MTA is permitted to proceed with any major construction work that is directly related to the construction of the entrances under the Preferred Alternative, Plaintiffs will suffer irreparable injury, because such construction work, even if something that could ultimately be undone, would be taken into account, and would prejudice the selection of alternatives, if the FTA and MTA are directed to undertake further environmental review in connection with this matter.

In the instant case, the work currently contemplated or actually begun violates the cited "committing resources" regulation precisely because it is work that will never be required once the Reduced Alternative 5 is selected. Work that need not be done unless a contemplated project is constructed pursuant to the very plans under attack may be challenged for that reason alone. See, e.g., *Village of Westbury v. NYDOT*, 75 N.Y.2d 62, 67 (1989), requiring SEQRA analysis of a proposal to add lanes to an interchange on an expanded Northern State Parkway when the addition and consequent disruption "served no purpose independent of the widening project."

Not only is the current work unnecessary, it is premature. As Mr. Cohen establishes in his declaration, the Reduced Alternative 5 does not require tearing up 86th Street to replace a sewer that will remain undisturbed once the Reduced Alternative 5 is adopted. Further,

the street destruction was not even scheduled until the 6th month of a three year initial construction contract, which would put it into February of 2012 at the soonest.   Having accelerated this unnecessary work smacks of the lack of "objective good faith" that is required of any valid NEPA review, *Sierra Club v. U.S. Army Corps of Engineers*, 701 F.2d 1011, 1030 (2d Cir. 1983).   If there is no need to destroy East 86th Street now, even were the north side mid-block alternative indisputably superior to all other approaches, then the equities demand that *status quo* be maintained.

### III.   INJUNCTIVE RELIEF MAY BE GRANTED IN SUPPORT OF PLAINTIFFS' SEQRA AND MISAPPLICATION OF PUBLIC FUNDS CLAIMS

Defendants have suggested that to the extent that plaintiffs' allege that defendants have violated the requirements of New York state environmental review, embodied in the State Environmental Quality Review Act ("SEQRA"), and allege that the MTA defendants violated New York law dealing with wrongful expenditure or misapplication of public funds, this court has no adjudicatory power.   MTA' Memorandum of law in Support of Motion to Dismiss, pages 15-20.   They are wrong, and to the extent that plaintiffs meet the requirements for granting a preliminary injunction under their NEPA claims the same relief is available under their SEQRA-based and misapplication of public funds claims.

#### A.   SEQRA

Defendants point out, correctly, that an environmental impact statement under SEQRA is not required of a "transit project" which requires a Federal EIS.   N.Y. Pub. Auth. Law section 1266-c.   The purpose of this statute is to eliminate redundancy, not to restrict the scope of inquiry in the EIS.   Federal courts routinely apply both SEQRA and NEPA analysis to projects that are jointly funded by the state and the Federal government, see, e.g., *Save  Our Parks v. Kempthorne*, 2006 WL 3378703, *4 (S.D.N.Y. Nov. 15, 2006), and *Stewart Park & Reserve*

*Coalition, Inc. v. Slater*, 352 F.3d 545, 558 (2d Cir. 2003).  The *Stewart Park* litigation involved highway access to an airport, arguably a "transit project" encompassed by the Public Authorities Law, see *Automobile Club of New York v. Cox*, 592 F.2d 658,662 (2d Cir. 1979)(expansion of a bus terminal is a "transit project"), yet the Circuit reviewed agency action under both SEQRA and NEPA.

   Plaintiffs have not found a case addressing the precise question; when state environmental review  is broader than NEPA, and Federal environmental review eliminates a separate state review process and environmental impact analysis, does judicial review of the adequacy of the Federal action encompass review of compliance with the state requirements? Plaintiffs suggest that the proper answer to the question is yes.  There is no reason to believe that the New York legislature intended to give agencies a free SEQRA pass when there is Federal money involved in a transit project.  Rather, it makes far better sense to hold that the intent of the state enactment was to eliminate two different EIS documents by combining the state and Federal analysis into one.

   If the agencies failed to properly review the East 86th Street entrance sitings for all the reasons set out in this memorandum and in the Initial MOL, then preliminary injunctive relief is just as available for SEQRA violations as it is for NEPA violations.  *New York v. Shinnecock Indian Nation*, 523 F.Supp.2d 185, 247 (E.D.N.Y. 2007).

   **B.**  **Misapplication of Public Funds**

   In Count III of the Complaint, plaintiffs allege that the MTA defendants violated General Municipal Law section 51 in supporting a construction scheme on the north side of East 86th Street that will waste public funds as compared to the far less expensive, far more efficient, and far safer placement of the subway entrances on the southeast corner.  Defendants, claiming that they are officials of state public benefit corporations, seek dismissal of the misapplication of

public funds claim because GML 51 only applies to officials of municipal corporations, and the MTA entities are not that.

Well, yes, but if the MTA defendants are what they claim to be, then they are subject to the same level of taxpayer scrutiny that applies to City officials, just under a different statute. They are covered by Public Authorities Law section 123-b, *Chester Civil Imp. Ass'n. v. .New York City Transit Authority*, 122 A.D.2d 715 (1st Dept. 1986), in so far as plaintiffs claim wrongful expenditure or misapplication of public funds. They committed the same wrong; it's just actionable under a different statute. This Court either can authorize amendment now or at trial; the proof will be the same. Fed. Rules Civ. Proc. Rule 15(b).

As with the SEQRA claims, if plaintiffs have succeeded in persuading this Court that a preliminary injunction is warranted, such relief is available to it under Pub. Auth. Law section 123-b. *Schulz v. State*, 217 A.D.2d 393, 396 (3rd Dept. 1995)(denying a preliminary injunction because the requirements for issuing such an injunction not met on the facts of the case).

[The Balance of This Page is Intentionally Left Blank]

## CONCLUSION

For the reasons stated in the declarations of plaintiffs' experts and that of the President of the Yorkshire Towers Tenants Association, and the legal arguments set out herein and in plaintiffs' Memorandum of law in Opposition to Defendants' Motion to Dismiss, the Motion for Preliminary Injunction should be granted.

Respectfully Submitted,

ANDERSON KILL & OLICK, P.C.

By: _____ */s/ Jeffrey E. Glen* _____

Jeffrey E. Glen (JG-8277)
Rene F. Hertzog (RH-9227)
1251 Avenue of the Americas
New York, New York  10020
(212) 278-1000
jglen@andersonkill.com
rhertzog@andersonkill.com

CECCARELLI WEPRIN PLLC

By: __ **/s/Joseph J. Ceccarelli** _____
Joseph J. Ceccarelli (JC-5329)
Erik J. Berglund (EB-1820)
Two Wall Street
New York, New York  10005-2008
(212) 227-4848
jceccarelli@cecwep.com
eberglund@cecwep.com

*Attorneys for Plaintiffs*
*Yorkshire Towers Company L.P.*
*and Yorkshire Towers Tenants*
*Association*

Dated:    New York, New York
          October 12, 2011