UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————— x
              :
YORKSHIRE TOWERS COMPANY L.P., *et*  :   11 CIV 1058 (TPG)
*ano.*              :
              :
       *Plaintiffs*,   :
              :
      - against -     :
              :
UNITED STATES DEPARTMENT OF   :
TRANSPORTATION, *et al.*,     :
              :
       *Defendants*.   :
              :
——————————————————————— x

**REPLY MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO DISMISS**

Bryan Cave LLP
1290 Avenue of the Americas
New York, New York  10104
*Attorneys for Defendants Metropolitan
Transportation Authority, Jay H. Walder in his
capacity as its Chairman, New York City Transit
Authority, Thomas F. Prendergast in his capacity as
its President, Metropolitan Transportation
Authority Capital Construction Company, and
Michael Horodniceanu in his capacity as its
President*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................ 1

POINT I        THE NEPA CLAIM IS TIME-BARRED ............................................................ 2

    A.        The New Theory Not Pleaded In The Complaint Should Not Be Considered In Deciding The Motion To Dismiss; Nor Should Plaintiffs Be Permitted To Amend Their Complaint Because It Would Be Unfairly Prejudicial To Defendants. ...................................................................................................... 3

    B.        Even If Plaintiffs' New Theory Were To Be Considered, It Fails To State A Claim Because A Supplemental Environmental Review Is Required With Respect To New Information Only Where That Information Bears On The Proposed Action And Its Impacts And Is Environmentally Significant. ................ 4

        1.        Reduced Alternative 5 ...................................................................................... 6

        2.        The Design Guidelines ................................................................................... 10

        3.        NFPA 130 ......................................................................................................... 12

        4.        Transportation Planning Considerations .................................................. 13

        5.        MTA Letters ...................................................................................................... 14

POINT II       THERE IS NO BASIS FOR APPLICATION OF THE DOCTRINE OF EQUITABLE TOLLING OR EQUITABLE ESTOPPEL ................................... 14

POINT III      THE STATE CLAIMS SHOULD BE DISMISSED ........................................... 18

CONCLUSION ...................................................................................................................... 20

# TABLE OF AUTHORITIES

## CASES

*A.Q.C. ex rel. Castillo v. United States*, __ F.3d __, 2011 WL 3926557 (2d Cir. Sept. 8, 2011) ...................................................................................................................14

*Beckman v. U.S. Postal Service*, 79 F. Supp. 2d 394 (S.D.N.Y. 2000) ...........................3

*Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 170 F.R.D. 111 (S.D.N.Y. 1997) ..................3

*City of New York v. Shalala*, 34 F.3d 1161 (2d Cir. 1994) .............................................14

*Department of Transportation v. Public Citizen*, 541 U.S. 752 (2004)...........................9

*Fla. Keys Citizens Coalition, Inc. v. U.S. Army Corps of Eng'rs*, 374 F. Supp. 2d 1116 (S.D. Fla. 2005).........................................................................................................8

*Friends of Ompompanoosuc v. FERC*, 968 F.2d 1549 (2d Cir. 1992) ................7, 9, 10

*Friends of the River v. FERC*, 720 F.2d 93 (D.C. Cir. 1983) ......................................6, 9

*Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51 (1984) ................1

*Ipreo Holdings LLC v. Thomson Reuters Corp.*, No. 09 CV 8099 (BSJ), 2011 WL. 855872 (S.D.N.Y. Mar. 8, 2011) ................................................................................3

*Johnson v. Nyack Hospital*, 86 F.3d 8 (2d Cir. 1996)....................................................14

*Kearney v. Cnty. of Rockland*, 373 F. Supp. 2d 434 (S.D.N.Y. 2005) .............................3

*Knaust v. City of Kingston*, No. 96-CV-601 (FJS), 1999 WL. 31106 (N.D.N.Y. Jan. 15, 1999) .......................................................................................................................5

*Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co.*, 292 F. Supp. 2d 535 (S.D.N.Y. 2003) .................................................................................................3

*Marsh v. Ore. Natural Resources Council*, 490 U.S. 360 (1989)................................5, 7

*Miller v. ITT Corp.*, 755 F.2d 20 (2d Cir. 1985)...........................................................14

*N. Idaho Community Action Network v. U.S. Department of Transport*, 545 F.3d 1147 (9th Cir. 2008)......................................................................................................8, 9

*NRDC v. FAA*, 564 F.3d 549 (2d Cir. 2009)....................................................................9

*National Audubon Society, Inc. v. Hoffman*, 132 F.3d 7 (2d Cir. 1997).........................................9

*Netzer v. Continuity Graphic Associates, Inc.*, 963 F. Supp. 1308 (S.D.N.Y. 1997) ...................14

*Pace v. DiGuglielmo*, 544 U.S. 408 (2005) .................................................................................14

*Pearl v. City of Long Beach*, 296 F.3d 76 (2d Cir. 2002) .............................................................14

*S. Trenton Residents Against 29 v. FHA*, 176 F.3d 658 (3d Cir. 1999).........................................8

*Saratoga Cnty. Chamber of Committee v. Pataki*, 100 N.Y.2d 801, 798 N.E.2d 1047
   (2003).......................................................................................................................................3

*Save Our Parks v. Kempthorne*, No. 06 *Civ.6859 NRB*, 2006 WL. 3378703 (S.D.N.Y.
   Nov. 15, 2006) ........................................................................................................................3

*Smith v. McGinnis*, 208 F.3d 13 (2d Cir. 2000).........................................................................14

*Southwick Clothing LLC v. GFT (USA) Corp.*, No. 99 CV 10542 (GBD), 2004 WL.
   2914093 (S.D.N.Y. Dec. 15, 2004).........................................................................................3

*State of Wis. v. Weinberger*, 745 F.2d 412 (7th Cir. 1984).........................................................5

*Stewart Park & Reserve Coalition, Inc. (SPARC) v. Slater*, 352 F.3d 545 (2d Cir. 2003)..............3

*Transactive Corp. v. N.Y. State Department of Social Services*, 92 N.Y.2d 579, 706
   N.E.2d 1180 (1998).................................................................................................................3

*Valverde v. Stinson*, 224 F.3d 129 (2d Cir. 2000).......................................................................1

*Zenith Radio Corp. v. Hazeltine Research Corp.*, 401 U.S. 321 (1971).........................................4

*Zerilli-Edelglass v. NYCTA*, 333 F.3d 74 (2d Cir. 2003)............................................................14

## STATUTES

23 C.F.R. § 771.119(b) .................................................................................................................7

23 C.F.R. § 771.123(c)..................................................................................................................7

23 C.F.R. § 771.130(a)(1)......................................................................................................5, 7, 13

23 U.S.C. § 139(l) .................................................................................................................1, 2, 13

N.Y. State Fin. Law § 123-b(1) ....................................................................................................3

## PRELIMINARY STATEMENT

The only federal claim pleaded in the Complaint is the allegation that the Federal Transit Administration ("FTA") violated the National Environmental Policy Act ("NEPA") by making a determination on October 29, 2009 not to require preparation of a supplemental environmental impact statement ("SEIS") for the relocation of the 86th Street Station's northern entrance from the supermarket in plaintiffs' building (the location assumed in the final environmental impact statement or "FEIS") to the sidewalk in front of that same building.  The Complaint alleges that the Supplemental Environmental Assessment ("SEA") prepared in May 2009 was deficient, and that FTA's issuance of the Finding of No Significant Impact ("FONSI") on October 29, 2009 was arbitrary and capricious.  As established in defendants' initial motion to dismiss papers,[1] the plaintiffs' challenge to the SEA and FONSI is barred by the 180-day statute of limitations established by the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users ("SAFETEA-LU").  *See* 23 U.S.C. § 139(l)(1).

In their memorandum of law opposing the motion to dismiss, plaintiffs do not deny that the Complaint was filed after the expiration of the 180-day limitations period and implicitly acknowledge that they cannot challenge either the SEA or FONSI based on any of the alleged deficiencies pleaded in their Complaint.  Instead, they now present an entirely new theory – that the defendants violated NEPA in that they allegedly failed to undertake a further environmental assessment of new information presented *after* the FONSI was issued.  These new allegations are nowhere mentioned in the Complaint, and it would be highly prejudicial to allow plaintiffs to amend their Complaint to plead them, because the design of the 86th Street Station entrance is 100 percent complete, construction has begun, and – since the work is on the critical

---

[1]	The FTA defendants joined in the motion to dismiss.

path to completion of the first phase of the Second Avenue Subway – any delay in its construction would be contrary to the public interest.

Moreover, plaintiffs' newly concocted allegations, even if properly pleaded, would not state a claim on which relief can be granted because: (i) most or all of the material they characterize as "new information" – which consists primarily of their proposed variation of an alternative already considered in the SEA – is not "new" at all and could have been submitted by plaintiffs during the public comment period on the SEA in 2009; and (ii) in any event, the alleged new information cited in plaintiffs' papers is not the sort of information that would require further environmental review under NEPA.  Because plaintiffs' "new information" contentions fail as a matter of law, the Court may rule upon defendants' motion to dismiss without reference to any factual disputes between the parties.

## POINT I

### THE NEPA CLAIM IS TIME-BARRED

This case was brought on by an 85-page Complaint, replete with allegations that the SEA was deficient and the FONSI arbitrary and capricious.  Defendants moved to dismiss the Complaint as untimely under SAFETEA-LU, which provides that a lawsuit filed subsequent to "180 days after publication of a notice in the Federal Register announcing that the … approval is final … shall be barred."  23 U.S.C. § 139(l)(1).  Here, the Federal Register notice was published on December 9, 2009, yet plaintiffs waited more than a year to file their lawsuit on February 16, 2011.

Instead of arguing that the Complaint was timely filed, plaintiffs overhaul their case entirely, asserting for the first time that defendants violated NEPA by failing to perform a supplemental environmental review necessitated by the submission of new information *subsequent* to issuance of the FONSI.  As plaintiffs put it, "[t]oday's issue is not primarily

whether the SEA and FONSI failed to meet NEPA requirements…. Today's issue is, rather did defendants critically evaluate the new information [provided after issuance of the FONSI] that cries out for a southeast corner entrance." Pls.' Mem. at 3.

      **A.**     **The New Theory Not Pleaded In The Complaint Should Not Be Considered In Deciding The Motion To Dismiss; Nor Should Plaintiffs Be Permitted To Amend Their Complaint Because It Would Be Unfairly Prejudicial To Defendants.**

      The new theory proffered in plaintiffs' litigation papers – that post-FONSI "new" information warrants further NEPA review – should not be considered on the motion to dismiss. The theory was not pleaded in the Complaint, and is different in kind and character than the Complaint's challenge to the FONSI based on alleged deficiencies in the SEA. Accordingly, plaintiffs' "new information" allegations asserted for the first time in their memorandum of law should not be considered. *See* Ipreo Holdings LLC v. Thomson Reuters Corp., 2011 WL 855872, at *6 (S.D.N.Y. Mar. 8, 2011) ("Plaintiff adds these new allegations in its opposition brief. . . . Plaintiff cannot amend its complaint in this manner."); Kearney v. Cnty. of Rockland, 373 F. Supp. 2d 434, 440 (S.D.N.Y. 2005) (rejecting claim raised for the first time in opposition brief to motion for summary judgment); Southwick Clothing LLC v. GFT (USA) Corp., 2004 WL 2914093, at *6 (S.D.N.Y. Dec. 15, 2004) ("A complaint cannot be amended merely by raising new facts and theories in plaintiffs' opposition papers, and hence such new allegations and claims should not be considered in resolving the motion."); Beckman v. U.S. Postal Serv., 79 F. Supp. 2d 394, 408 (S.D.N.Y. 2000) (stating that non-pleaded claims will not be considered in the context of a motion for summary judgment); Bonnie & Co. Fashions, Inc. v. Bankers Trust Co., 170 F.R.D. 111, 119 (S.D.N.Y. 1997) (noting that "it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment").

Nor should plaintiffs be permitted to file an amended complaint to plead their new theory.  They have not moved for leave to file an amended pleading.  *See* Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co., 292 F. Supp. 2d 535, 544 (S.D.N.Y. 2003) ("A summary judgment opposition brief is not a substitute for a timely motion to amend the complaint.").

More importantly, a court will not permit a complaint to be amended where doing so would unfairly prejudice the defendant.  *See* Zenith Radio Corp. v. Hazeltine Research Corp., 401 U.S. 321, 330-31 (1971) ("[I]n deciding whether to permit … amendment [of pleadings], the trial court was required to take into account any prejudice that Zenith would have suffered as a result.").  Two years have passed since the FONSI was issued, the design of the 86th Street Station is finalized, the construction contract was awarded, construction has commenced, and a delay in the work would delay the opening of the Second Avenue Subway in 2016 (*see* Defendants' declaration of Bradford C. Robinson ("Robinson Decl.") ¶¶ 4, 11-12, 24-43; Defendants' declaration of Richard Paupst ("Paupst Decl.") ¶¶ 5, 33), thereby delaying benefits to transit users (*see* Robinson Decl. ¶¶ 41, 43) and  causing enormous economic harm to MTA (*see* Defendant's declaration of Anil Parikh ("Parikh Decl.") ¶¶ 11-12).  Moreover, plaintiffs have not explained why they could not have brought forward their new station entrance alternative during the public comment period on the SEA in 2009.

**B.   Even If Plaintiffs' New Theory Were To Be Considered, It Fails To State A Claim Because A Supplemental Environmental Review Is Required With Respect To New Information Only Where That Information Bears On The Proposed Action And Its Impacts And Is Environmentally Significant.**

Plaintiffs' newly propounded theory also fails to state a claim.  SAFETEA-LU's "Limitations on Claims" provision requires consideration of new information only "if the information satisfies the requirements for a supplemental environmental impact statement under

section 771.130 of title 23, Code of Federal Regulations."  23 U.S.C. § 139(l)(2).  The "new

information" cited by plaintiffs does not warrant an SEIS under this regulatory provision.

Under § 771.130, only two kinds of new information may trigger the need to

prepare an SEIS.  First, a supplemental review is required where an agency proposes "changes to

the proposed action" and where the changes would result in new "significant environmental

impacts" not previously considered.  23 C.F.R. § 771.130(a)(1).  This provision is not relevant

here, because plaintiffs have not alleged that MTA has made any changes to the 86th Street

Station entrance since the FONSI was issued in 2009.  Thus, here, there are no alleged "changes

to the proposed action" that could reopen the NEPA process.

Second, an SEIS may be required where "[n]ew information or circumstances

relevant to environmental concerns and *bearing on the proposed action or its impacts* would

result in *significant environmental impacts not evaluated in the EIS*."  23 C.F.R. § 771.130(a)(2)

(emphasis added).  Thus, an agency need not consider in a supplemental environmental review

every shred of new information that turns up after completion of the NEPA process.  Rather, that

obligation arises only where the information bears "on the proposed action or its impacts" and

"would result in significant environmental impacts" not previously addressed.

The limits codified in § 771.130(a)(2) on the "new information" to be considered

after conclusion of the NEPA process are in accord with well-settled NEPA jurisprudence.  The

Supreme Court has observed that "an agency need not supplement an EIS every time new

information comes to light after the EIS is finalized.  To require otherwise would render agency

decision making intractable."  Marsh v. Ore. Natural Res. Council, 490 U.S. 360, 373 (1989).

Rather, an SEIS is required only where "the new information is sufficient to show that the

remaining action will 'affec[t] the quality of the human environment' in a significant manner or

to a significant extent not already considered." <u>Id.</u> at 374.  New information must provide "a *seriously* different picture of the environmental landscape such that another hard look is necessary."  <u>State of Wis. v. Weinberger</u>, 745 F.2d 412, 418 (7th Cir. 1984); *see also* <u>Knaust v. City of Kingston</u>, 1999 WL 31106, at *5 n.5 (N.D.N.Y. Jan. 15, 1999).  The regulations do not require "that an agency must release and circulate a formal supplemental EIS, or a formal document explaining why the agency believes a supplemental EIS is unnecessary, every time some new information comes to light.  Rather, a reasonableness standard governs."  <u>Friends of the River v. FERC</u>, 720 F.2d 93, 109 (D.C. Cir. 1983).

   As explained below, the material now cited by plaintiffs in their litigation papers cannot reasonably be construed as "new information" bearing on significant impacts *of the proposed action*, and as a matter of law does not give rise to the need for a supplemental review.

   **1.**  **Reduced Alternative 5**

   As discussed in defendants' moving brief, plaintiffs seek to prevent MTA from locating two sets of subway station escalators in the sidewalk in front of their building, which is on the north side of East 86th Street between Second and First Avenues (the "Preferred Alternative" or "proposed action").  *See* Defs. Mem. at 2, 6-11.  The centerpiece of plaintiff's revamped challenge to the Preferred Alternative is their elevator-only proposal, which they refer to as "Reduced Alternative 5," a variation of an option already considered in the SEA in which the subway entrance would be served only by elevators located on the southeastern corner of 86th Street and Second Avenue.  The primary difference between the "Alternative 5" considered in the SEA and plaintiffs' "Reduced Alternative 5" is that plaintiffs have eliminated the elevator lobby included in Alternative 5 so that under their proposal persons waiting for an elevator would be required to stand on the sidewalk on 86th Street.  (One of plaintiffs' witnesses notes

that during the A.M. rush hour, this would result in 129 people waiting on the sidewalk at once. *See* Lutin Decl. Ex. 3 at 4.)

Plaintiffs assert that defendants' failure to consider Reduced Alternative 5 in a supplemental NEPA review is arbitrary and capricious.[2]  But as noted above, new information may trigger the need for further NEPA review only where (i) the new information bears on the *proposed action* such that (ii) the *proposed action* would result in new, previously unknown and unidentified environmental impacts.  *See* 23 C.F.R. § 771.130(a)(2); Marsh v. Ore. Natural Res. Council, 490 U.S. at 373-74.  Whatever may be said of the advantages and disadvantages of Reduced Alternative 5, this "new" alternative does not establish that the *proposed action* – the escalator entrance on the north side of 86th Street that the agencies selected in 2009 – will have new previously unknown and unidentified environmental impacts.  Thus, the new alternative that is the linchpin in plaintiffs' effort to salvage their time-barred lawsuit is not the sort of new information that requires the agencies to embark upon a new NEPA process.

Plaintiffs cite cases highlighting the central role that alternatives play under the statute.  Pls. Mem. at 11-13.  These cases involve the adequacy of the agency's consideration of alternatives *in an EIS*, rather than the consideration of new information regarding the alleged benefit of some new alternative proposed for the first time *after* an environmental review has been completed.  It is certainly so that alternatives to a proposed action must be thoroughly considered in an EIS.  *See* 23 C.F.R. § 771.123(c).  It also is true that alternatives to a proposed

---

[2]    In their memorandum of law in support of their preliminary injunction motion (at p. 3), plaintiffs also assert that "the *only* site for the 86th Street entrance that is not arbitrary and capricious is the southeast corner … design and construction approaches that our experts devised."  Thus, plaintiffs would have *this Court* select Reduced Alternative 5 (elevators only) over the entrance location selected by the agencies through a public process, in contravention of the bedrock principle that courts may not substitute their judgment for that of the agencies in substantive decision making.  *See, e.g.*, Marsh v. Ore. Natural Res. Council, 490 U.S. at 378.

action must be considered in an Environmental Assessment, albeit to a lesser extent.  *See* Friends of Ompompanoosuc v. FERC, 968 F.2d 1549, 1558 (2d Cir. 1992); 23 C.F.R. § 771.119(b). However, it does not follow from these principles that new information coming to light with respect to alternatives to the proposed (now approved) action *after* the NEPA process has been completed requires a whole new round of environmental review.  Indeed, under the plain language of the relevant regulations cited above and clear precedent, the opposite is true.  *See* Fla. Keys Citizens Coalition, Inc. v. U.S. Army Corps of Eng'rs, 374 F. Supp. 2d 1116, 1146 (S.D. Fla. 2005) ("new information must both (1) relate to the environment, and (2) *have direct relevance to the proposed action or its impacts*" (emphasis added)); S. Trenton Residents Against 29 v. FHA, 176 F.3d 658 (3d Cir. 1999) (changed conditions "must be relevant to the project and result in significant environmental impact not evaluated in the [FEIS]").

Thus, the Ninth Circuit rejected claims that transportation agencies violated NEPA by failing to consider a tunnel alternative introduced after the finalization of both an EIS and an SEA.  The court held that "[a]n agency is not required by NEPA to consider new *alternatives* that come to light after issuance of the EIS absent 'substantial changes in the proposed action relevant to environmental concerns,' or 'significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.'"  N. Idaho Cmty. Action Network v. U.S. Dep't of Transp., 545 F.3d 1147, 1155 (9th Cir. 2008) (quoting NEPA regulations).  The court found that "the tunnel alternative is not new 'information' or a new 'circumstance' regarding environmental impacts that may not have been appreciated or considered when the … EIS was prepared…."  Id. at 1155-56.  Likewise, plaintiffs' proffer of a modification to an already evaluated alternative more than a year after the NEPA process was completed in 2009 does not open the door to a supplemental review.

This conclusion is consistent with sound public policy.  Plaintiffs would have the defendants go back to square one – after seven different alternatives were studied in the SEA; after a public comment period was held in which dozens of comments were received from elected officials, civic organizations and members of the public[3]; after FTA approved the selection of the Preferred Alternative and determined in the FONSI that it did not have significant environmental impacts not previously studied in the FEIS and did not require preparation of an SEIS; after the period for challenging that FTA determination has run; after final design has been completed; after a construction contract has been signed; and after construction work has commenced.  This interpretation of NEPA would make the statute unworkable and "risk immobilizing the agency."  Friends of the River v. FERC, 720 F.2d at 109.

Moreover, plaintiffs waived any contention that Reduced Alternative 5 should be considered under NEPA because they failed to raise this alternative during the public comment period on the SEA in 2009.  See Dep't of Transp. v. Public Citizen, 541 U.S. 752, 764-65 (2004) (holding that plaintiffs "forfeited any objection to the EA on the ground that it failed adequately to discuss potential alternatives" because during the comment period they did not identify any alternatives beyond those evaluated in the EA); N. Idaho Cmty. Action Network v. U.S. Dep't of Transp., 545 F.3d at 1156 n.2 ("[B]ecause the tunnel alternative was not raised and identified until June 2006, well after the notice and comment periods for the 1999 EIS and the 2005 EA closed, any objection to the failure to consider that alternative has been waived.").[4]

---

[3]     Unlike plaintiffs, the civic organization Civitas did propose a new alternative during the comment period.  This alternative was carefully considered by defendants and was evaluated and discussed in the Summary of Comments and Responses attached to the FONSI.  See FONSI, Att. A at 9-14.

[4]     Plaintiffs cite NRDC v. FAA, 564 F.3d 549, 558 (2d Cir. 2009), but that case *rejected* a challenge to an alternatives analysis that bears similarities to plaintiffs' challenge in the

Finally, even if Reduced Alternative 5 were to be considered, it would immediately fail MTA's screening criteria (*see* SEA at 1-15) because it cannot be constructed without resulting in severe delay to the Second Avenue Subway's overall construction schedule. *See* Robinson Decl. ¶¶ 44-48; Paupst Decl. ¶¶ 31-33.  Plaintiffs' Reduced Alternative 5 is also demonstrably inferior to the entrance configuration selected by the agencies in 2009, for the same reasons that they rejected the similar Alternative 5 in 2009.  *See* Paupst Decl. ¶¶ 24-34; Defendants'' declaration of Allyson Bechtel ("Bechtel Decl.") ¶¶ 5, 15-17, 19-20, 36; Defendants' declaration of Robert Montfort (Montfort Decl.") ¶¶ 2, 25-32.

## 2.    The Design Guidelines

Plaintiffs assert as "new information" that MTA allegedly concealed and failed to follow the "Planning and Design Guidelines for New Underground Stations" prepared by MTA's consultants DMJM-Harris/ARUP in 2004 (the "Design Guidelines" or "DG") in selecting the entrance location.  But these guidelines are an internal planning tool MTA prepared years ago, and are hardly the sort of new information that would require a new environmental review.  Moreover, the issues raised by plaintiffs with respect to the Design Guidelines relate to the merits of the Preferred Alternative as compared to Reduced Alternative 5, and do not establish

---

instant case, including a contention by the plaintiff that the agency had abused its discretion by not reviewing an alternative similar in both advantages and disadvantages to one studied in the EIS.  564 F.3d at 558 ("the similarities between the two alternatives, in both advantages and disadvantages, preclude us from concluding that the FAA arbitrarily reviewed the latter alternative but not the former").  Similarly, Reduced Alternative 5 here is similar to Alternative 5 considered in the SEA and would suffer from its same disadvantages in being an elevator-only entrance that is inconvenient for most of the subway riders, who would need to cross the six lanes of 86th Street to use the subway entrance.  *See* SEA at S-27, 1-10, 5-22.  "It is well-settled that under NEPA the range of alternatives that must be discussed is a matter within an agency's discretion."  <u>Friends of Ompompanoosuc</u>, 968 F.2d at 1558.

any new, previously undisclosed significant environmental impacts of the Preferred Alternative. For that reason alone, they provide no basis for a supplemental NEPA review.

In any event, it is clear from the Design Guidelines themselves that the Preferred Alternative is entirely consistent with relevant planning considerations. For example, the Design Guidelines note that "[s]tation entrance location is influenced by the direction of passenger approach within the catchment area," DG at 10-4; direct  that "[e]ntrance placement *shall* be determined based on customer convenience, geographic factors, and the ability to serve the greatest portion of the station catchment area possible," id. (emphasis added); and advise as a "key point" that project designers should "locate station entrances to maximize customer access and convenience." Id. at 10-18.  These considerations were cited in the SEA as a principal basis for selecting the Preferred Alternative.  *See* SEA (annexed as Exh. C to Declaration of Philip E. Karmel dated Sept. 1, 2011 ("Karmel Decl.")) at S-27, 1-10, 5-22.  Thus, it is preposterous for plaintiffs to fault MTA for choosing the Preferred Alternative "based on the arbitrary and selective emphasis on one secondary consideration, purported passenger convenience."  Cohen Decl. ¶ 9.  Plaintiffs correctly point out that the Design Guidelines also note that "[c]orner entrances are preferred over mid-block entrances." DG at 10-14.  However, the document is clear that this preference is a "recommendation" only, and not a siting mandate.  Id.  It was entirely consistent with the Design Guidelines for MTA, after weighing catchment area and convenience considerations against the preference for corner locations, to opt for the Preferred Alternative. Moreover, the two escalators near Second Avenue in the Preferred Alternative are located close to the corner – they are, in fact, closer to Second Avenue than 4 of the 5 elevators included in the plaintiffs' Reduced Alternative 5.  *See* Paupst Decl. ¶ 27.

Plaintiffs further argue that the Preferred Alternative is at odds with the Design Guidelines in that it is located on the sidewalk rather than at an off-street location.  But the Design Guidelines clearly provide for such "Street (Sidewalk) Entrances," saying that they are "a traditional part of the NYCT system" that "shall be considered where space permits and zoning regulations, station configuration, or methods of construction do not preclude their use."  DG at 10-5.

Moreover, as described in the SEA, MTA developed "minimum criteria" to be applied to the candidate locations under consideration for the entrance, and specified the goals and objectives to be considered in making the selection.  These customized criteria were consistent with the Design Guidelines, and provided a rational framework for resolving the specific question before the agencies.  *See* SEA at 1-15, 1-16.[5]

### 3.    NFPA 130

Plaintiffs make much of the fact that the NFPA revised its 2007 standard for subway entrances in 2010, so that NFPA now formally recognizes that it is permissible to provide up to 50 percent of emergency station egress by elevator if the design criteria are satisfied.  As with plaintiffs' other arguments, this one misses the mark as a matter of law because it merely relates to the feasibility of aspects of Reduced Alternative 5.  It does not establish that the Preferred Alternative would result in new significant environmental impacts

---

[5]    Plaintiffs themselves seem to interpret the Design Guidelines as advisory, since their Reduced Alternative 5 is inconsistent with factors to be considered under the guidance. The Design Guidelines advise that "a minimum of one stair and one escalator shall be provided" at each entrance (DG at 10-18), but the plaintiffs' Reduced Alternative 5 has no stairs and no escalators.  All of the other station entrances included in Phase 1 of the Second Avenue Subway do have stairs and/or escalators; none of them is an "elevator-only" entrance.  *See* Paupst Decl. ¶ 26.  Reduced Alternative 5 would also be inconsistent with plaintiffs' (incorrect) interpretation of the Design Guidelines as disfavoring sidewalk entrances since it would require that people wait on the sidewalk for elevators.

previously unidentified in the FEIS or SEA.  Indeed, plaintiffs acknowledge that the Preferred

Alternative complies with both the 2007 and 2010 editions of NFPA 130.  *See* Conrad Decl. ¶ 5.

Moreover, even before the 2010 edition of NFPA 130, elevators were recognized

as an acceptable means of emergency egress under the "equivalency" mechanism built into the

NFPA standard.  *See* Montfort Decl. ¶¶ 14-19.  Thus, NFPA 130 is not material new

information; nor does it establish any new significant impacts of the Preferred Alternative that

was selected in 2009.  Therefore, NFPA 130 does not require consideration in a supplemental

NEPA review.

### 4.     Transportation Planning Considerations

In their memorandum of law in opposition to the motion to dismiss, plaintiffs

state that they will present "new information" that defendants supposedly failed to consider the

"platoon" and "maximum surge" effect in the SEA.  *See* Pl. Mem. at 18.  But their witness on

this subject (Mr. Lutin) makes no such claim, presumably because he realized that the SEA did

consider these matters.  *See* SEA at Appendix B; Bechtel Decl. ¶¶ 53-57.  Moreover, the effort to

critique the SEA's conclusions is waived because plaintiffs could have presented this

information during the public comment period on the SEA in 2009, and time-barred because

plaintiffs failed to challenge the SEA and FONSI within 180 days of their being published in the

Federal Register pursuant to 23 U.S.C. § 139(l)(1).

Mr. Lutin: (i) puts forward his comparison of the "passenger convenience"

benefits of the Preferred Alternative against those of Reduced Alternative 5; and (ii) summarizes

the "Transportation Advantages" he believes Reduced Alternative 5 has to offer.  As

demonstrated in the Bechtel Declaration, Mr. Lutin's computations are rife with errors that bias

his conclusions in favor of Reduced Alternative 5.  *See* Bechtel Decl. ¶¶ 19-52.  But even more

fundamentally, plaintiffs again offer evidence that is immaterial to the motion to dismiss because

it merely relates to the supposed advantages of their elevator-only alternative.  Information on

that subject, whether accurate or as flawed as that presented in the Lutin Declaration, is not a

predicate for a new NEPA process under 23 C.F.R. § 771.130 because it does not establish that

the Preferred Alternative will result in previously unidentified significant environmental impacts.

### 5.      MTA Letters

Plaintiffs assert that two letters from MTA are "new information" meriting

examination in a supplemental review.  This allegation reveals their profound misunderstanding

of the sort of information that would lead to the reopening of the NEPA process.  Nothing in

these letters establishes that the Preferred Alternative will result in new, previously unknown

significant environmental impacts that warrant further study under NEPA.

### POINT II

### THERE IS NO BASIS FOR APPLICATION OF THE DOCTRINE OF EQUITABLE TOLLING OR EQUITABLE ESTOPPEL

Plaintiffs' contention that the Court should exercise its equitable powers to

preclude the defendants from asserting the statute of limitations as a defense must be rejected.[6]

For equitable estoppel to apply, a plaintiff must show "both that the Government

made a misrepresentation upon which [plaintiffs] reasonably and detrimentally relied and that the

Government engaged in affirmative misconduct."  City of New York v. Shalala, 34 F.3d 1161,

1168 (2d Cir. 1994).  "Equitable estoppel is applicable … where … 'egregious wrongdoing' by a

defendant prevents a plaintiff from bringing suit on a claim of which the plaintiff is aware."

---

[6]      The SAFETEA-LU limitations period may be jurisdictional.  *See* John R. Sand Co. v. United States, 552 U.S. 130 (2008); *but see* Sierra Club N. Star Chapter v. Peters, Civil No. 07-2593 (MJD/SRN), 2008 WL 2152199, at *6 (D. Minn. May 15, 2008).  The Court need not reach this issue because, as discussed *infra*, there is no basis for either equitable estoppel or equitable tolling.

Netzer v. Continuity Graphic Assocs., Inc., 963 F. Supp. 1308, 1316 (S.D.N.Y. 1997) (citation omitted).

Equitable tolling only applies in "'rare and exceptional circumstance[s]'" where "a party is 'prevented in some extraordinary way from exercising his rights.'" Zerilli-Edelglass v. NYCTA, 333 F.3d 74, 80 (2d Cir. 2003) (quoting Smith v. McGinnis, 208 F.3d 13, 17 (2d Cir. 2000), and Johnson v. Nyack Hosp., 86 F.3d 8, 12 (2d Cir. 1996)); A.Q.C. ex rel. Castillo v. United States, __ F.3d __, 2011 WL 3926557, at *7 (2d Cir. Sept. 8, 2011) ("equitable tolling is considered a drastic remedy applicable only in 'rare and exceptional circumstance[s]'" (quoting Smith, 208 F.3d at 17)).  To benefit from equitable tolling, a plaintiff "bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way."  Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005).

The Second Circuit has stated that it "will apply the equitable tolling doctrine 'as a matter of fairness' where a plaintiff has been 'prevented in some extraordinary way from exercising his rights,'" but that "we made it clear that we had in mind a situation where a plaintiff 'could show that it would have been *impossible* for a reasonably prudent person to learn' about his or her cause of action."  Pearl v. City of Long Beach, 296 F.3d 76, 85 (2d Cir. 2002) (quoting Miller v. ITT Corp., 755 F.2d 20, 24 (2d Cir. 1985)).  Specifically, the party seeking equitable tolling must "demonstrate a causal relationship between the extraordinary circumstances on which the claim for equitable tolling rests and the lateness of his filing," and that "demonstration … cannot be made if the [party], acting with reasonable diligence, could have filed on time notwithstanding the extraordinary circumstances."  Valverde v. Stinson, 224 F.3d 129, 134 (2d Cir. 2000).

In light of these principles it is absurd to argue, as plaintiffs have, that equitable estoppel or equitable tolling should apply here because MTA was purportedly unresponsive to their inquiries, did not provide courtesy copies of its correspondence with public officials, and did not discuss the Design Guidelines in the SEA.  Pls.' Mem. at 22-24.  None of this alleged conduct rises to the level of "affirmative misconduct" required for equitable estoppel, and none of that conduct induced the plaintiffs to file their lawsuit after the expiration of the 180-day statute of limitations period.

As regards equitable tolling, plaintiffs cannot demonstrate that they have pursued their rights diligently.  Plaintiffs do not deny actual and contemporaneous knowledge of the SEA, FONSI or the FTA's notice in the *Federal Register*.  There is no question that plaintiffs were aware of, and submitted comments on, the SEA, including written comments from their current litigation counsel.  *See* FONSI (Karmel Decl., Ex. B), Att. A at 3.  And, at the very least, plaintiffs should have acquired knowledge of the FONSI and FTA's *Federal Register* notice through the exercise of reasonable diligence, given that they "have been very concerned with and have followed closely for the past seven years the plans and explanations of [MTA] for … construction of the Second Avenue Subway."  Gopstein Decl. ¶ 2.  Indeed, reasonable diligence requires plaintiffs to be cognizant of the applicable law.  *See* Heckler v. Community Health Services of Crawford County, Inc., 467 U.S. 51, 63 (1984) ("those who deal with the Government are expected to know the law").  Here, the FONSI and the impending award of a construction contract for the Preferred Alternative were covered by local press (*see* Dan Rivoli, "Station Plans Move Forward," *Our Town: Upper East Side News & Community*, Dec. 3, 2009, annexed as Exh. A to the Reply Declaration of Philip E. Karmel submitted herewith), and the FTA published a proper notice in the *Federal Register*, as required under SAFETEA-LU.  On

this record, a reasonably diligent person would have been able to file suit within 180 days of the publishing of that notice, but plaintiffs failed to do so.  Even assuming plaintiffs had pursued their rights diligently, they utterly fail to identify any extraordinary circumstance that made it impossible for them timely to challenge the FONSI, as required to invoke equitable tolling, and cite no analogous cases.

Plaintiffs cite several cases in which a defendant's concealment or affirmative misrepresentations were found to justify equitable tolling, *see* Pls.' Mem. at 22, but those cases are of no help to their case.  Plaintiffs identify no active concealment or other misconduct by the FTA, and with respect to the MTA merely allege that it should have, prior to the issuance of the FONSI in 2009, made specific reference to the Design Guidelines and shared more information relating to the anticipated cost of the 86th Street Station.  Id. at 23.  These allegations fall far short of the "extraordinary circumstance" required to justify the drastic remedy of equitable tolling, especially where, as here, there is no showing that a person acting with reasonable diligence could not have filed on time notwithstanding the allegedly extraordinary circumstances.  *See* Castillo, 2011 WL 3926557, at *7; Pearl, 296 F.3d at 85.

Plaintiffs' reliance on Sierra Club North Star Chapter v. Peters, Civil No. 07-2593 (MJD/SRN), 2008 WL 2152199 (D. Minn. May 15, 2008), is also misplaced.  There, the Federal Highway Administration's *Federal Register* notice actually misstated the statutory deadline for filing claims by two days, and the plaintiff commenced its suit one day late and thus *within* the time specified in the *Federal Register* notice.  2008 WL 2152199, at *6.  The Court found that the limitations period for plaintiff's claims should be tolled because "the FHWA, through its publication of a misleading Federal Register notice, lulled [plaintiff] into inaction."  Id. at *10. The court emphasized that plaintiff had "filed its Complaint *before* the deadline promulgated by

17

the FHWA and only missed the actual statutory deadline by one day."  Id.  Here, by contrast,

there was no government-created confusion regarding the filing deadline, and plaintiffs filed

their lawsuit more than eight months after the date specified in FTA's *Federal Register* notice

and thus more than eight months after the statute of limitations had expired.

For the foregoing reasons, plaintiffs may not invoke equitable estoppel or tolling

to cure their failure to file this case within the limitations period set forth in 23 U.S.C.

§ 139(l)(1).

## POINT III

### THE STATE CLAIMS SHOULD BE DISMISSED

Plaintiffs make a half-hearted attempt to salvage their state-law claims in the

memorandum of law in support of their motion for a preliminary injunction ("Pls.' Prelim. Inj.

Mem.").  However, in doing so, plaintiffs misconstrue applicable state law.  Moreover, they

provide no reason why the Court should maintain supplemental jurisdiction over the state claims

once the federal NEPA claim is dismissed.

With respect to their claim under the State Environmental Quality Review Act

("SEQRA"), plaintiffs make up their own interpretation of the New York Public Authorities Law

("PAL") provision that exempts any "transit project" for which a federal EIS is prepared from

SEQRA compliance (there is a similar exemption for MTA acts or activities in connection with

the planning and construction of a transportation facility).  *See* PAL §§ 1266(11), 1266-c(11).  In

plaintiffs' view, the intent of the PAL provision was merely to "eliminate two different EIS

documents by combining the state and Federal analysis into one."  Pls.' Prelim. Inj. Mem. at 14.

Building from this notion, they advance the theory that a federal court considering the adequacy

of the NEPA review for a project covered by the PAL exemption should also consider whether

the requirements of SEQRA have been satisfied.  Id.  They provide no authority to underpin this

18

theory, nor could they since the plain language of the statute exempts such projects entirely from

SEQRA.  *See* PAL §§ 1266(11), 1266-c(11) (providing that a transit project or MTA acts or

activities in connection with the planning and construction of a transportation facility for which

an EIS has been prepared under NEPA shall not be "subject to the provisions of [SEQRA]").

Moreover, SEQRA itself allows for preparation of a single EIS where both federal and state

agencies are involved in the review of an action.  *See* N.Y. Envtl. Conserv. Law § 8-1111.  PAL

§ 1266(11) and PAL § 1266-c(11) do not merely duplicate this provision but are instead clearly

intended to create a more expansive exemption from SEQRA for projects such as the Second

Avenue Subway.[7]

 With respect to their claim under the New York General Municipal Law

("GML"), plaintiffs concede that defendants are not "municipalities" subject to the GML's

taxpayer action (GML § 51), but in the same breath they assert that defendants are "covered by

Public Authorities Law section 123-b."  Pls.' Prelim. Inj. Mem. at 15.  But the Public Authorities

Law does not have a section 123-b.[8]

---

[7] The decisions cited by plaintiff applying both SEQRA and NEPA to projects that are
jointly funded by the state and federal government, *see* Pls.' Prelim. Inj. Mem. at 13-14,
are not applicable.  Those cases do not concern "transit projects" as defined by the PAL
(*see* PAL §§ 1200(15), 1266-c(1)) or MTA acts or activities in connection with the
planning and construction of a transportation facility (*see* PAL §§ 1261(17), 1266(1)).
*See* Stewart Park & Reserve Coalition, Inc. (SPARC) v. Slater, 352 F.3d 545 (2d Cir.
2003) (challenging federal and state actions approving a "project to construct an
interchange connecting an interstate highway to an airport"); Save Our Parks v.
Kempthorne, No. 06 Civ.6859 NRB, 2006 WL 3378703 (S.D.N.Y. Nov. 15, 2006)
(challenging National Park Service determination associated with new Yankee Stadium).

[8] Plaintiffs may be referring to section 123-b of the State Finance Law, which creates a
taxpayer action against a state officer "who in the course of his or her duties has caused,
is now causing, or is about to cause a wrongful expenditure, misappropriation,
misapplication, or any other illegal or unconstitutional disbursement of state funds or
state property."  N.Y. State Fin. Law § 123-b(1).  Section 123-b does not cover "[c]laims
which seek review of a State actor's alleged mismanagement of funds or the arbitrary and

## CONCLUSION

For the foregoing reasons, and those specified in defendants' initial moving papers, defendants' motion to dismiss should be granted.

Dated: New York, New York
      October 25, 2011

Respectfully submitted,

BRYAN CAVE LLP

By: *Philip E. Karmel*

    Philip E. Karmel (pekarmel@bryancave.com)
    J. Kevin Healy (jkhealy@bryancave.com)
1290 Avenue of the Americas
New York, New York  10104
Telephone: 212-541-2000
*Attorneys for Defendants Metropolitan
Transportation Authority, Jay H. Walder in his
capacity as its Chairman, New York City Transit
Authority, Thomas F. Prendergast in his capacity as
its President, Metropolitan Transportation
Authority Capital Construction Company, and
Michael Horodniceanu in his capacity as its
President*

---

capricious distribution of funds lawfully allocated to an agency." Transactive Corp. v. N.Y. State Dep't of Social Servs., 92 N.Y.2d 579, 589, 706 N.E.2d 1180, 1184 (1998); see also Saratoga Cnty. Chamber of Comm. v. Pataki, 100 N.Y.2d 801, 813, 798 N.E.2d 1047, 1053 (2003) ("[A] claim that state funds are not being spent wisely is patently insufficient to satisfy the minimum threshold for standing ...."). Plaintiffs should not be permitted to amend their complaint to include such a frivolous claim.