UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------x
YORKSHIRE TOWERS COMPANY, L.P. and
YORKSHIRE TOWERS TENANTS ASSOCIATION,

**Case No. 11-cv- 1058 (TPG)**

Plaintiffs,

-against-

UNITED STATES DEPARTMENT OF
TRANSPORTATION *et al.*
Defendants.
----------------------------------------------------------------------x

YORKSHIRE TOWERS COMPANY, L.P. and          **Case No. 10-cv-8973 (TPG)**
YORKSHIRE TOWERS TENANTS ASSOCIATION,

Plaintiffs,

-against-

THE FEDERAL TRANSIT ADMINISTRATION, *et al.*
Defendants.
----------------------------------------------------------------------x

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**ANDERSON KILL & OLICK, P.C.**

1251 Avenue of the Americas
New York, New York  10020

**CECCARELLI WEPRIN PLLC**

Two Wall Street
New York, New York  10005-2008

Attorneys for Plaintiffs
*Yorkshire Towers Company, L.P. and*
*Yorkshire Towers Tenants Association*

## Table of Contents

PRELIMINARY STATEMENT .......................................................................... 3

STATEMENT OF FURTHER RELEVANT FACTS ......................................... 4

**POINT I.**  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ......................... 8

**POINT II.**  PLAINTIFFS' CLAIMS ARE FULLY COMPREHENDED  IN THE
COMPLAINT AS FILED .............................................................................. 16

**POINT III.**  THE MTA'S CLAIM OF HUGE FINANCIAL INJURY WERE A
PRELIMINARY INJUNCTION TO ISSUE ARE, LIKE REPORTS OF MARK TWAIN'S
DEATH, "HIGHLY EXAGGERATED". .......................................................... 17

CONCLUSION ............................................................................................ 19

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bailey v. United States,*
    516 U.S. 137 (1995) .............................................................................. 7

*Bob Marshall Alliance v. Hodel,*
    852 F.2d 1223 (9th Cir. 1988) .............................................................. 9

*Calvert Cliffs Coordianting Committee v. U.S. Atomic Energy Comm.*
    449 F.N 1109 ........................................................................................ 9

*Concerned Citizens of Chappaqua v. U.S. Dept. of Transportation,*
    579 F.Supp.2d 427 ................................................................................ 5

*Dep't of Transp. v. Public Citizen,*
    541 U.S. 752 (2004) ............................................................................ 13

*Florida Keys Citizens Coalition Inc. v. US Army Corps of Engineers,*
    374 F. Supp.2d 1116 (S.D.Fl. 2005) ...................................................... 7

*Friends of Ompompanoosuc v. FERC,*
    968 F.2d 1549 (2nd Cir. 1992) ............................................................ 11

*Hanly v. Kleindienst,*
    471 F.2d 823 (2d Cir. 1972) ................................................................ 12

*Hanly v. Mitchell,*
    460 F.2d 640 (2d Cir. 1972) ................................................................ 12

*Hibbs v. Winn,*
    542 U.S. 88 (2004) ................................................................................ 7

*Knaust v. City of Kingston,*
    1999 WL 31106 (N.D.N.Y. Jan. 15, 1999) .......................................... 11

*Motor Vehicle Manufacturers Ass'n v. State Farm Mut. Automobile Ins. Co.,*
    463 U.S. 29 (1983) ................................................................................ 2

*Natural Resources Defense Council v. U.S. Dept. of Agriculture,*
    613 F.3d 76 (2nd Cir. 2010) .................................................................. 1

*National Audubon Society v. Hoffman,*
    132 F.3d 7 (2d Cir. 1997) .................................................................... 11

*Natural Resources Defense Council, Inc., v. Federal Aviation Admin.,*
564 F.3d 549 (2nd Cir. 2009) ............................................................. 12

*Natural Resources Defense Council v. U.S. Army Corps of Engineers,*
399 F.Supp.2d 386 (S.D.N.Y. 2005) .................................................. 11

*New York v. Shinnecock Indian Nation,*
523 F ..................................................................................................... 5

*North Idaho Community Action Network v. US Dept of Transportation,*
545 F.3d 1147 (9th Cir. 2008) ............................................................ 13

*Prairie Band Pottawatomie Nation v. Federal Highway Administration,*
751 F.Supp.2d 1174 (D. Kansas 2010) .............................................. 12

*Senville v. Peters,*
327 F. Supp.2d 335 (D. Vt. 2004) ...................................................... 10

*Sprietsma v. Mercury Marine,*
537 U.S. 51 (2003) ............................................................................... 7

*State of Wisconsin v. Weinberger,*
745 F.2d 412 (7th Cir. 1984) ........................................................ 11, 13

*Suffolk County v. Sec. of Interior,*
562 F.2d 1368 (2nd Cir. 1977) ........................................................... 13

## STATUTES

23 U.S.C. § 139(l)(2) ................................................................................... 7

FOIA ........................................................................................................... 13

NEPA ................................................................................................... passim

## OTHER AUTHORITIES

23 C.F.R.§ 771.130(a)(2) ........................................................................ 6, 7

23 C.F.R. § 771.130(f) .................................................................... 6, 7, 8, 12

23 C.F.R. § 777.130 ......................................................................... 7, 9, 10

40 C.F.R. § 1502.1 .................................................................................... 12

Federal Rules of Civil Procedure Rule 15(d) ........................................... 15

## PRELIMINARY STATEMENT

Plaintiffs demonstrated, in their submissions in support of their motion for preliminary injunction and in opposition to defendants' motion to dismiss, that the "Preferred Alternative" chosen by defendants for the location of the 86th street entrance to the Second Avenue Subway is indefensible in light of the comprehensive information that supports locating the entrance on the southeast corner of Second avenue and 86th street.  Defendants seek to excuse their refusal to consider all this information by creating an interpretation of the regulations governing supplementation of environmental impact statements and environmental assessments that contradicts the plain meaning of the regulations, has no support in case law, and just plain makes no sense.  The Argument section of this Reply memorandum addresses these points.

Defendants also submitted declarations and exhibits in opposition to the motion for preliminary injunction which purport to defend their siting of the entrances on the north side of 86th street, in front of Yorkshire Towers. In a set of Reply Declarations, which are encapsulated below in plaintiffs' Statement of Further Relevant Facts, plaintiffs establish that once the MTA and FTA take the hard look at the new information provided by plaintiffs that they are required to do by NEPA, any ultimate decision to retain the north side mid-block siting will be arbitrary and capricious both because it "runs counter to the evidence before the agency" and because it is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Natural Resources Defense Council v. U.S. Dept. of Agriculture*, 613 F.3d 76, 83 (2nd

Cir. 2010), quoting from *Motor Vehicle Manufacturers Ass'n v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983).

Plaintiffs also bring before the Court the arrogant and totally unnecessary destruction of the trees and sidewalks on 86th street between Second and First avenues that has occurred between the parties' last appearance before the Court on September 27, and today.  Defendants, in their haste to change the facts on the ground and to attempt to render any action by this Court to preserve the *status quo* nugatory, have created "immediately hazardous conditions at the driveway entrance and exit of Yorkshire Towers". See Declaration of Jamey R. Ehrman, P.E. and supporting documentation listed below in the Further Statement of Relevant Facts.  The scope of work done by defendants over the last weeks, while not violative of any order of this Court, is surely beyond the limited preparatory removal of street signs and setting up of a fence partitioning the existing sidewalk that was discussed as the upcoming work at the last Court appearance.

## STATEMENT OF FURTHER RELEVANT FACTS

As we did in our initial memorandum of law, we here outline the contents of the reply declarations and associated exhibits that area being presented to the Court.

### Edward L. Cohen

As he did in his original Declaration, Mr. Cohen puts the immediate issue into the proper perspective; have the defendants ignored the new information that establishes definitively that Reduced Alternative 5, when properly considered, renders the choice of the "Preferred Alternative" arbitrary and capricious.  Mr. Cohen demonstrates, both in his own work and drawing on the declarations of the rest of his

-4-

team, that once the 2010 NFPA code is recognized as the only proper approach to deep station egress safety concerns, the Reduced Alt 5 solution eliminates an extraneous set of stairs and thus eliminates any possible need for work in the bed of 868th street.  To destroy that street when it will never be touched to build the southeast corner entrance is worse than unnecessary; it is simply throwing money and resources away.

Mr. Cohen also emphasizes that by violating its own design guidelines, exhaustively analyzed in his first declaration, the MTA ignores its proclaimed "safety first" policy.  To refuse to reduce unnecessary risk to the passengers and firefighters cannot be other than arbitrary and capricious.

Mr. Cohen goes on to refute many of the factual contentions in the Paupst Declaration, submitted by defendants.

### Jerome M. Lutin

Mr. Lutin has reviewed the Declaration of Allyson Bechtel, submitted by defendants.  Ms. Bechtel discusses travel times between Alternative 7 (the "Preferred Alternative") and Reduced Alternative 5.  She claims that both pedestrian walking times to the entrance and vertical transit times from the entrance to the subway platform are faster for Alternative 7.  Mr. Lutin demonstrates that Ms. Bechtel is mistaken on both counts.

Mr. Lutin has also reviewed the Declaration of Robert Montfort, submitted by defendants.  Mr. Montfort argues that the evacuation times in an emergency from Alternative 7 will be faster than the times from Reduced Alternative 5.  As with Ms. Bechtel's contentions, Mr. Lutin demonstrates that Mr. Montfort is mistaken.

Finally, Mr. Lutin has reviewed the Declaration of Richard Paupst, submitted by defendants. Mr. Paupst supports the conclusions of Ms. Bechtel and Mr. Montfort, and adds some subjective opinions regarding passenger convenience. Mr. Lutin demonstrates that Mr. Paupst's contentions are drawn from erroneous factual assumptions, especially regarding the capacities of the lobby for the southeast corner entrance designed by plaintiffs' experts, and raises sharp questions about Mr. Paupst's views on anticipated passenger behavior.

The critical point is not that the MTA must accept Mr. Lutin's view over that of defendants' engineers and designers. Rather, as we argued extensively in the two memoranda submitted previously, under NEPA the MTA must take a hard look at Mr. Lutin's refutation of Ms. Bechtel, Mr. Montfort, and Mr. Paupst, and then make a considered and unbiased decision.

### Ernest A. Conrad

Mr. Conrad has reviewed the Montfort Declaration, points out numerous errors, and concludes that the MTA's continued refusal to recognize the superiority of elevators over stairs and escalators in an 80 foot deep station rejects the best modern thinking. As counsel, we add just one more point; for the MTA to categorically reject even taking a hard look at an alternative that would avoid, in an emergency, hordes of passengers having to walk up 80 feet of stationary escalators is precisely the kind of implausible decision-making that, as the Supreme Court has ruled, voids even procedurally proper final agency action.

**The Demolition Declarations**

Since the last time this matter was before the court, and contrary to statements made at that time by MTA counsel,  the MTA has cut down four decades-old trees on the north side of 86th street, in front of Yorkshire Towers, cut down four more similar trees across the street, and marked four apparently younger trees for imminent destruction.  Declaration of Francesca Morrone and accompanying photographs.  The MTA has placed site construction barriers at the driveway exits and  entrances to Yorkshire Towers which obstruct visibility for automobiles entering and exiting, causing "immediately hazardous conditions."  Declaration of Jamey R. Ehrman and Site Visit Report #22 (an exhibit thereto).  The destruction of the sidewalk, and the obstructions caused by the barriers, are shown in the photos taken by Carlos Pena and described in his Declaration.

The recent sorry story is recounted at length, and  put  in historical context, in the Declaration of Doron Gopstein, President of plaintiff Yorkshire Towers Tenants Association.

Destruction of trees, "which is essentially irreversible", is irreparable injury sufficient to support issuance of a preliminary injunction.  *New York v. Shinnecock Indian Nation*, 523 F.Supp.2d 185, 301 (E.D.N.Y. 2007); *Concerned Citizens of Chappaqua v. U.S. Dept. of Transportation*, 579 F.Supp.2d 427, 432 (S.D.N.Y. 2008) ("specimen" trees).  There was just no reason to destroy these trees, and to tear up the sidewalk, because the street bed of East 86th street will never need to be touched once Reduced Alternative 5 is selected, either because defendants see reason or because the Court rules in plaintiffs' favor.  The ostensible reason for the destruction is to replace

a sewer and utility lines under 86th street, but "there is no need for any utility relocation under Reduced Alternative 5…"  Declaration of Kenneth C. Eipel.

The destruction should be stopped, and defendants should be ordered to forthwith  take a hard look at Reduced Alternative 5.

## ARGUMENT

### POINT I.

### PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

Defendants contend that plaintiffs have failed to show likelihood of success on the merits, and in doing so incorporate by reference into their opposition to the motion for a preliminary injunction their "motion to dismiss papers."  Defendants Memorandum of Law in Opposition to Plaintiffs Motion for a Preliminary Injunction ("DMOL-PI"), at 6 and 7.[1]   Their argument rises or falls on their contention that the wealth of "new information" that plaintiffs submitted to the MTA after the SEA and FONSI were issued cannot be considered by this Court because the only "new information" that counts is "new information … [that] bears on the *proposed action* such that the *proposed action* would result in new, previously unknown and unidentified environmental impacts."  Defendants' Reply Memorandum of Law in Support of Motion to Dismiss ("Reply MOL")(emphasis in original), referencing 23 C.F.R.§ 771.130(a)(2).

At the most fundamental level, the claim is based on a misreading of § 771.130(a)(2), and on ignoring the clear language of 23 C.F.R. § 771.130(f).

---

[1] Plaintiffs' initial Memorandum of Law in Support of Motion for Preliminary Injunction is referred to herein as "PMOL-PI".

Subsection 130(a)(2) states that "An EIS **shall be supplemented** whenever … New Information or circumstances relevant to environmental concerns **and bearing on the proposed action or its impacts** would result in significant environmental impacts not evaluated in the EIS." (emphasis supplied). It does not state, contrary to defendants' paraphrase, that supplementation is required only when the "proposed action" would result in environmental impacts. The difference is huge, and in the context of this litigation is dispositive. If the agency itself decides to change a proposed action, then, it is true, the agency must supplement its EIS to consider significant environmental impacts, but that requirement is codified in subsection 130(a)(1).[2]    Subsection 130(a)(2) deals not with agency changes, but with the environmental impact of other factors that would "bear on" the proposed action or "its impacts."[3]    And that is precisely what is at issue in the case; a full and unbiased evaluation of the environmental impact of Reduced Alternative 5 would "bear on" the proposed action by resulting in it not happening.    To confine the obligation to supplement the EIS to changes in the "proposed action" is to read subsection 130(a)(2) out of the regulation.[4]

---

[2] Subsection 130(a)(1) reads "An EIS shall be supplemented whenever … Changes to the proposed action would result in significant environmental impacts that were not evaluated in the EIS."

[3] The "new information" must deal with impacts on the project that is the subject of NEPA review, and not with efforts to mitigate "pre-existing environmental conditions."  Defendants' citation to such cases as *Florida Keys Citizens Coalition Inc. v. US Army Corps of Engineers*, 374 F.Supp.2d 1116, 1146 (S.D.Fl. 2005) are off point.

[4] A statute – or here a regulation granted statutory authority by virtue of the reference to it in 23. U.S.C. § 139 -- should be construed so that "effect is given to all of its provisions, so that no part will be inoperative or superfluous, void or insignificant."  *Hibbs v. Winn*, 542 U.S. 88, 101 (2004); *Sprietsma v. Mercury Marine*, 537 U.S. 51, 63 (2003); *Bailey v. United States*, 516 U.S. 137, 146 (1995)("we assume that Congress used two terms [or, in this case, six total subsections to 23 C.F.R. 771.130] because it intended each term to have a particular, not superfluous meaning.")

In addition to the mandate of subsection 130(a)(2), the agencies at least had to consider whether supplementation of the EIS, or a supplemental EA, was required under 23 C.F.R. § 771.130 (f).  This section states that "a supplemental EIS may be required to address issues of limited scope, such as …the evaluation of location or design variations for a limited portion of the overall project."  The overall project for which an FEIS was issued in 2004 is the entire Second Avenue Subway from 96th street to 63rd street.  The "new information" provided by plaintiffs, to wit the design for and analysis of Reduced Alternative 5, is specifically calculated to trigger an "evaluation of location" of the 86th street entrances, and constitutes a "design variation" of the version of Alternative 5 that was included in the SEA and the FONSI.[5]

23 C.F.R. § 771.130(f) goes on to contemplate the "suspension of project" activities" which might "limit the choice of reasonable alternatives."  Since the "new information" goes precisely to the reasonableness of the agencies' choosing the north side midblock entrance over the southeast corner entrance, a suspension of work progressing the "preferred alternative" is surely in order while the MTA considers, if plaintiffs are successful in this action, whether a full supplemental EIS is required under subsection (f).  In fact, such a partial suspension is  envisioned in subsection 771.130(f) where, as here the 86th street entrance work is budgeted at less than two percent of the cost of the entire portion of the Second Avenue Subway currently under work.  A suspension while the agencies complete the evaluation job required of them by NEPA will not affect at all 98% of the work on the subway, and as demonstrated in our earlier submissions in support of our motion for preliminary injunction, and in the declaration of

---

[5] The "new information" exception to the six month limitations period of 23 U.S.C. § 139(l)(2) deals with information relevant to a supplemental EIS under all of 23 C.F.R. § 777.130, not just subsection (a).

submitted herewith, there is ample time for the agencies to carry out their NEPA duties in relation to Reduced Alternative 5 without delaying at all the completion of the 86th street entrance

Consideration of alternatives is not a requirement unique to subsection (f). It applies as well to original EIS evaluations. "The consideration of alternatives requirement . . . guarantees that agency decision makers [have] before [them] and take into proper account all possible approaches to a particular project . . . which would alter the environmental impact and the cost-benefit analysis." *Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1228 (9th Cir. 1988)(*quoting Calvert Cliffs Coordinating Comm. v. U. S. Atomic Energy Comm'n*, 449 F.2d 1109, 1114 (D.C. Cir. 1971)). "NEPA's requirement that alternatives be studied, developed, and described both guides the substance of environmental decision-making and provides evidence that the mandated decision making process has actually taken place." Id. Nothing in the law, regulations, or cases suggests that these policy considerations counsel a lessened standard of agency review when dealing with "new information" as required by 23 C.F.R. §771.130(f).

Counsel for the MTA, and separately counsel for the FTA, rejected the plain legal principles incorporated in 23 C.F.R. § 777.130 when they argued, at the first court hearing on September 26, 2011, that the cited section, and its companion time-bar provision, applied only to changes in the "proposed action"[6]

---

[6] "[Y]our Honor . . . whatever they may say about their new alternative that does not establish that the alternative that we selected in 2009 has new environmental impacts.  And in the absence of new information indicating there are new environmental impacts, there is no legal basis to require a supplemental environmental impact statement.  Their entire

The Court, however, instinctively and correctly spoke directly to the applicability of 23 C.F.R. § 771.130 to new information relating not only to the proposed action, but to the available alternatives:

> Let me just address both of you. You see, it would be certainly premature to rule as a matter of law that their new information was not new information within that regulation. In other words, the initial consideration took into account alternatives that was part of the environmental impact statement discussion, was it not? Yes, it was. Okay. So if alternatives were part of what was presented in the environmental impact statement and the supplemental environmental impact statement, then new information about an alternative, it seems to me, I am not prepared to say that that is not new information within this regulation. Transcript at 33:8-17.

This is precisely the correct analysis,

Where circumstances have changed sufficiently, "NEPA required that FHWA consider alternatives to its selected alternative in the environmental document it prepared." *Senville v. Peters*, 327 F. Supp.2d 335 (D. Vt. 2004). The changed circumstance in the instant case, of course, is the preparation at vast expense by

---

case is based on this idea that they have a new alternative. Now, it's not that new, and we can brief that to the Court. But the fundamental point that I'm trying to make is that even if they did come up with a new alternative that would be as a matter of law totally irrelevant to the standard that is in the CFR for a court like this requiring a supplemental environmental impact statement." Address of Philip Karmel, Esq., Transcript at 25:22-26:9.

"Your Honor, if I may clarify. The new information has to be with respect to the proposed action. The proposed action here is the action that was undertaken by the agencies in 2009, which was with respect to the northern entrance." Address of Joseph Pantoja, Esq.. Transcript at 33:19-22.

plaintiff of Reduced Alternative 5, a solution to the 86th street entrance problem that is far safer, cheaper, and environmentally sounder than the Preferred Alternative.

Defendants purport to deal with the issue by noting the truism that not every item of new information triggers the need for supplemental assessment. See DMOL-PI at pages 5 – 6. Plaintiffs agree that the new information must provide a "seriously different picture", *State of Wisconsin v. Weinberger*, 745 F.2d 412, 418 (7th Cir. 1984), cited at DMOL-PI page 6, in order for an agency decision not to supplement its environmental considerations to be reasonably required.[7]

But in order to consider the seriousness of the new information, the agency must actually consider it. In *Knaust v. City of Kingston*, 1999 WL 31106 (N.D.N.Y. Jan. 15, 1999), relied on by defendants, new information submitted after an EA was published led to a stay of the Federal action involved – there the funding of an industrial park – while a full supplemental EA was prepared. Similarly, in *Friends of Ompompanoosuc v. FERC,* 968 F.2d 1549, 1552 (2nd Cir. 1992), cited by defendants for another point at DMOL-PI page 8, additional comments and information submitted after the release of the EA, including "further mitigation measures" submitted by the challengers to the adequacy of the NEPA review, led to the creation and issuance of a supplemental EA. In sharp contrast, here the MTA and the FTA have refused even to evaluate plaintiffs' solution the problem of locating the 86th street entrance in a way that "would avoid or minimize adverse impacts or enhance the quality of the human

---

[7] While new information does not always trigger new NEPA obligations, the cases hold uniformly that the threshold for preparation of a supplemental EA or EIS is a low one. A "party challenging the agency's decision not to prepare a supplemental EIS must show only that there is a substantial possibility that the action **may** have significant new impacts, not that it clearly will have such impacts." *Natural Resources Defense Council v. U.S. Army Corps of Engineers,* 399 F.Supp.2d 386, 411 (S.D.N.Y. 2005)(emphasis added). If the issue of significance is a "close call", supplemental environmental analysis should be performed. *National Audubon Society v. Hoffman,* 132 F.3d 7, 13 (2d Cir. 1997)

environment,"[8] which is the stated purpose of an EIS, 40 C.F.R. § 1502.1, see *Natural Resources Defense Council, Inc., v. Federal Aviation Admin.*, 564 F.3d 549, 556 (2nd Cir. 2009)(analyzed in depth in PMOL-PI as the *West Bay* decision).

Moreover, in determining whether the discussion of a new alternative is required in a supplemental environmental impact statement or assessment, the cost of the various alternatives is a factor that must be considered. *Prairie Band Pottawatomie Nation v. Federal Highway Administration*, 751 F.Supp.2d 1174, 1197 (D. Kansas 2010). The MTA has stonewalled the entire 86th Street community who has requested information regarding the construction costs of reasonable alternatives, including Plaintiffs. This is the same cost information that the MTA Defendants have arbitrarily withheld from United States Congresswoman Carolyn B. Maloney, without whom there likely would be no Second Avenue Subway Project in the first place. They have withheld the same documentation from the rest of the entire Coalition of Upper East Side Elected Officials as well. See complaint, ¶¶ 13-18, in case No. 11-cv-1058 (TPG). There is therefore no fair or reasonable basis for Defendants to argue that other alternatives cannot be considered in this environmental lawsuit on these grounds alone.

In sum, this is a case in which a remand for further NEPA compliance is required because of "an accumulation of new information [that] was ignored by the

---

[8] The human environment has been broadly construed to include protection of quality of life issues for affected residents of a project including "noise, traffic, overburdened mass transportation systems, crime, congestion and even availability of drugs". *See Hanly v. Mitchell*, 460 F.2d 640, 647 (2d Cir. 1972). After the Second Circuit's decision in *Hanly* was remanded and the district court denied the motion for preliminary injunction, the plaintiffs again appealed to the Second Circuit. In "*Hanly II*", the Second Circuit found that while the General Services Administration addressed some of the issues raised by the Court of Appeals in the earlier decision, the assessment failed to make implicit findings as to the possibility of increased crime in the area of the proposed detention center and the effect of the drug treatment center. For these reasons, and with the acknowledgement that further assessment would add to the time and expense already incurred and only prolong the final determination, the Court found remand again necessary. *Hanly v. Kleindienst*, 471 F.2d 823, 834-36 (2d Cir. 1972).

-14-

agency in whole or in part, such that the failure to act on it was an abuse of the agency's discretion in light of the alleged significance of the information." *State of Wisconsin v. Weinberger, supra*, at 418.   Plaintiffs have shown through their new information that defendants have thus far "failed adequately to discuss some reasonable alternative,"   -- here Reduced Alternative 5 – and thus "raise issues sufficiently important to permit the introduction of new evidence in the district court, including expert testimony with respect to technical matters, both in challenges to the sufficiency of an environmental impact statement and in suits attacking an agency determination that no such statement is necessary. *Suffolk County v. Sec. of Interior*, 562 F.2d 1368, 1384-85 (2nd Cir. 1977).[9]

*Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 764-65 (2004), where the Supreme Court held that plaintiffs "forfeited any objection to the EA on the ground that it failed adequately to discuss potential alternatives" because during the comment period they did not identify any alternatives beyond those evaluated in the EA, is irrelevant to this instant case.[10]   On June 29, 2009, during the public comment period, plaintiffs submitted correspondence which identified numerous potential alternatives to the Preferred Alternative in front of Yorkshire Towers, including reconsidering the allegedly minor passenger convenience benefits of the Preferred Alternative when compared with

---

[9] The Ninth Circuit appears to have taken the view that there is no need for an agency to consider the environmental impact on a project of a wholly new alternative, never previously proposed, after the completion of the environmental review.  *North Idaho Community Action Network v. US Dept of Transportation*, 545 F.3d 1147, 1155-56 (9th Cir. 2008).  In the instant case, of course, Reduced Alternative 5 is a proposal to implement an alternative that was rejected by the MTA but made far superior to the selected alternative through significant design variations.  Thus the instant case falls squarely within the requirement to evaluate new information found in 23 C.F.R. § 771.130(f), a provision not included in the regulation, 40 C.F.R. § 1502.9, that was at issue in *North Idaho*.  In any event, it is the *Suffolk County* holding, that specifically includes consideration of alternatives in the new information universe, and not *North Idaho*, which controls in the Second Circuit.

[10] See also *North Idaho, supra* at 1156, n.2 (alternate ground).

Alternatives 2 and 5, and considering alternatives on the northwest corner. (citation to FOIA case)  There is simply no waiver here.  Even were it a fact – which it is not – that plaintiffs had not identified a plethora of alternatives to the northside mid-block selection, the conscious concealment of such vital documents as the Design Guidelines and the MTA acceptance of the 2010 National fire code amendments from public knowledge or scrutiny would vitiate any waiver argument.  See Plaintiffs' Memorandum of Law in Opposition to Motion to Dismiss, pages 16-19.

### POINT II.

### PLAINTIFFS' CLAIMS ARE FULLY COMPREHENDED
### IN THE COMPLAINT AS FILED

Defendants seem to contend that Plaintiffs' allegations that defendants failed to consider at all, let alone provide adequate NEPA analysis of, the elaborate and comprehensive redesign of Alternative 5 that has become known in this litigation as "Reduced Alt. 5" cannot be considered by this Court absent a formal motion to amend the complaint.  This is, plaintiffs submit, sheer nonsense.

The complaint is replete with allegations that defendants never considered the variety of changes that would make Alternative 5 by far the superior alternative for the 86th street entrances.  Paragraph 179 – 197 allege a dozen points where adequate consideration would lead any sensible agency to select a revised Alternative 5, and which make the stubborn retention of Alternative 7 as preferred both arbitrary and capricious.

It is true that some of the specifics of the redesign are not referred to in detail in the complaint, but that is due to the simple fact that the redesign was a work in

progress throughout the negotiation period.   Under what we trust was not a misapprehension that the negotiations were being held in good faith, the MTA engineers and designers raised, point by point, their concerns with plaintiffs' design for a reduced Alternative 5, and plaintiffs' experts dealt with them, point by point.  By the time the MTA decided to stop negotiating, Reduced Alt 5 was a fully detailed and documented plan to solve the access issue at 86th street with reduced environmental impact both during construction and once in operation, with enhanced pedestrian access, with greater safety, and at lower cost.

If this Court believes that the final Reduced Alt 5 ought to be pleaded in detail, plaintiffs of course can do so.  But it would be surplus age, and an exaltation of form over substance.  Simply as a technical matter, there is a motion before the court, albeit a motion for preliminary injunction, which raises in detail all of the aspects of Reduced Alt 5, and defendants cannot contend that they are not on reasonable notice of what Reduced Alt 5 is – they have had the drawings since August.  All the formal requirements of Federal Rules of Civil Procedure Rule 15(d) are met.

**POINT III.**

**THE MTA'S CLAIM OF HUGE FINANCIAL INJURY WERE A PRELIMINARY INJUNCTION TO ISSUE ARE, LIKE REPORTS OF MARK TWAIN'S DEATH, "HIGHLY EXAGGERATED".**

The MTA's contention that an injunction will cause it to respond in damages to its contractor is highly speculative, if not fanciful.  Under the applicable contract, which the MTA awarded in August of 2011 well after the instant litigation had

been commenced, a prerequisite to any contractor claim for damages is that the delay in any work "neither was not could have been anticipated by the Contractor." Declaration of Anil Parikh, Ex. F to Karmel Declaration of October 245, 2011, ¶7. If the MTA didn't tell its contractor that a serious lawsuit was in being that could well result in a requirement that work on the 86th street entrance be halted while NEPA compliance was under court review, the fault lies with the MTA, not with plaintiffs.

Further, under the contract damages are only conceptually available if the delay affects an item "on the critical path as indicated in a currently updated Schedule Document." Id. While "Schedule Document" does not appear to be a defined term under the MTA contract, the MTA admits, through the declaration of Bradford Washington, Ex. E to Karmel Declaration of October 25, 2011, ¶19, that at the moment the contractor is working under a "Draft CPM Schedule" that Mr. Robinson does not expect to be incorporated into the "integrated project schedule" before the end of 2011. Yet further, before the contractor can even claim damages the delay must cause the extension of the Substantial Completion Date for the entire subway project, Contract Article 2.02A, not merely a delay in "specific completion milestones as Mr. Parikh alleges, Parikh declaration paragraph 6. On these points, also see Declaration of Edward Cohen, October 11m 2011, submitted previously in support of the instant motion, ¶s30ff, demonstrating that the 86th street work is not properly critical path work, and that in any event a halt to such work pending the resolution of this litigation cannot delay completion of the SAS.

Finally on this point, the damages that a contractor could claim even were an injunction to trigger a claim area limited to increased costs for maintaining the field office, storage of material, increased wage rates, and costs to keep the work site open.  Parikh declaration paragraph 10.  Since all that is going on now is preparation of the work site, there can be no increased costs if the contractor is kept from the site for a period of time; there is simply no work site to keep open or materials to store, and in today's economy the chance that wages are going up over the next few months is miniscule.  If Mr. Parikh truly believes that the MTA will incur labor costs of $50,000 per day when there will be zero laborers on site and no obligation to pay them he has no business running this project.

Had the MTA not accepted a bid in apparent violation of the "Buy America" act back in the spring of 2011, thus causing it to lose months in its contracting process, no street work would have occurred for six months after the contract was awarded under the then published schedule.  If there is any reason to speed up the destruction of 86th street in front of Yorkshire Towers other than spite, it is due to the MTA's incompetence in contracting, and nothing else.

## CONCLUSION

For the reasons stated herein, in plaintiffs' memoranda of law previously submitted, in all the declarations and supporting exhibits submitted by plaintiffs to date, and especially in response to the MTA's decision to destroy the peace and tranquility of the Yorkshire Towers neighborhood and to put the safety of its residents and visitors at risk for no purpose, Plaintiffs respectfully request that their motion for preliminary

-19-

injunction issue, that defendants be enjoined to replace forthwith the trees precipitously hewn down with planters containing evergreens so as to in some way reproduce that which has been exterminated, to replace the sidewalks on East 86th street between Second and First Avenues, and to stop all physical work on the 86th street entrances to the Second Avenue Subway, pending the determination of defendants' motion to dismiss.

Respectfully Submitted,

ANDERSON KILL & OLICK, P.C.

By: _____ */s/ Jeffrey E. Glen*_____

Jeffrey E. Glen (JG-8277)
Rene F. Hertzog (RH-9227)
1251 Avenue of the Americas
New York, New York  10020
(212) 278-1000
jglen@andersonkill.com
rhertzog@andersonkill.com

CECCARELLI WEPRIN PLLC

By: _____ **/s/ Joseph J. Ceccarelli**_____
Joseph J. Ceccarelli (JC-5329)
Erik J. Berglund (EB-1820)
Two Wall Street
New York, New York  10005-2008
(212) 227-4848
jceccarelli@cecwep.com
eberglund@cecwep.com

*Attorneys for Plaintiffs*
*Yorkshire Towers Company L.P.*
*and Yorkshire Towers Tenants*
*Association*

Dated:   New York, New York
         October 28, 2011