UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

YORKSHIRE TOWERS COMPANY, L.P. and                    **Case No. 11-cv-1058** (TPG)
YORKSHIRE TOWERS TENANTS ASSOCIATION,

                                    Plaintiffs,

                                                       **Reply Declaration**
            -against-                                  **of Doron Gopstein**
                                                           **(8 of 8)**

UNITED STATES DEPARTMENT OF
TRANSPORTATION, et al
                                    Defendants.
------------------------------------------------------------------------x
YORKSHIRE TOWERS COMPANY, L.P. and
YORKSHIRE TOWERS TENANTS ASSOCIATION,

                                    Plaintiffs,         **Case No. 10-cv-8973** (TPG)

            -against-

THE FEDERAL TRANSIT ADMINISTRATION, et al


                                    Defendants.
------------------------------------------------------------------------x


       Doron Gopstein declares the following:

       1.      I am President of the Yorkshire Towers Tenants Association ("YOTTA"), a co-

plaintiff in this action. YOTTA is a voluntary association concerned with the interests and

welfare of the over 2000 residents of Yorkshire Towers, a 21-story building located at 305-315

East 86th Street in Manhattan.  The building has hundreds of residents who have lived here for

many years and raised their families here.  We have many elderly residents and many younger

families with children.

2.      This Reply Declaration is submitted in further support of plaintiffs' motion for preliminary injunctive relief and in further opposition to defendants' companion limitations motion regarding new information under 23 U.S.C. 139(l)(2).

3.      We wish to update the Court on events that have taken place since we were before the court at the hearing on September 26, 2011.

4.      The first thing that the MTA did after that the hearing before this court is the only action that is truly irreparable-- they chopped down the trees in front of Yorkshire Towers and the adjoining area on our street (some small ones were removed for replanting).

5.      The next thing the MTA did was tear up, destroy and remove most of the sidewalk in front of Yorkshire Towers, a few hundred feet from east to west, leaving a narrow passage way (with space ranging, as measured yesterday, from 5 feet 1 inch to 6 feet 6 inches depending on the timber and concrete bases and various obstructions) for people to pass through. At the September 26 hearing, the tearing up of the sidewalk is work that the Court described as "heavy work," not light work (such as taking down signs or putting up a fence).

MTA Chops Down Trees In Front of Yorkshire Towers

6.      I would like to first address the cutting down of the trees. We understand of course that sometimes during construction that may be unavoidable, and the MTA has said generally that they would do it as part of differing phases of this project. But we believe it is common sense that the cutting down of trees should be done only if it is absolutely clear that there is no alternative. In this lawsuit, our highly experienced expert engineers and designers

have stated and are stating strongly to this court in this hearing their view that there are alternatives and that this does not (or, did not) have to happen.

7.      Late on October 11, 2011 I checked my emails and saw an email from Claudia Wilson, the Community Liaison for the Second Avenue Subway project for the MTA, dated October 11 at 4:49 pm. advising me that the MTA would begin to take down trees "on about October 12."  The next morning, October 12, soon after 8 am, the MTA came in and in a matter of a few hours chopped down all the trees (except for a few smaller ones removed for replanting). I watched it happening and it took place with an almost brutal speed and efficiency, especially when compared with the MTA's long delays and failure to act in past years on other phases of this project[*]

---

[*]The MTA's atypical conduct in this sudden rush of activity in chopping down the trees and tearing up the sidewalk before our building becomes more apparent when compared to some of its past conduct and is worth a brief recitation. In the 2004 Final Environmental Impact Statement ("FEIS") that it presented to the FTA and the FTA approved, the MTA proposed to build the 86th Street entrance within the first floor of our building, in space occupied by a large Food Emporium store. Over more than three years, both before and after the adoption of the FEIS, I and other members of our community repeatedly asked the MTA's top officials at public meetings of the Second Avenue Subway Task Force whether they had done all the necessary work to be sure that our building was structurally capable of taking this construction. The MTA seemed to always hedge somewhat in their answers but said that based on their knowledge the building was capable of accepting this large entrance. We kept asking whether they had done all the necessary structural analysis and I specifically asked them please come into the building and do any necessary analysis. After more than three years, in approximately 2007, they finally sent their engineers into our building and quickly discovered that structurally our building could not possibly tolerate the entrance they had been committed to for over three years without major structural changes and major resident dislocation. They therefore had to quickly abandon that plan and adopt another plan, and so they chose the midblock entrances (despite their own Guidelines preferences against their choice, which we did not know about and which they did not reveal to the public).

In a written submission to the MTA and the FTA in 2009 concerning the Supplementary Environmental Assessment, I included a recitation of the above history. In their response to this comment, the MTA and the FTA tried to blame us for their long and inexcusable delay by falsely stating in the FONSI that "the MTA engaged in protracted discussions and litigation with the owner and tenant to obtain such access and did not obtain until March 2007, pursuant to a court order." (FONSI, p. A-14) This was false. There were no such negotiations. There was no litigation. There was no court order. To the contrary, we wanted them to come and examine. They apparently were probably thinking of a court order that they obtained to gain access to another building, on East 72nd Street, in connection with the Second Avenue Subway (please see a fuller statement at Complaint, paragraphs 208-212). [Footnote continued on next page]

8.      Trees have a special resonance and importance to a community, and certainly to our residents and our adjoining community. Their removal has left many with a real sense of shock and loss. Many of our residents have lived in our large building for over 30 or 40 years. Some of these trees were ones they have seen, coming and going, every day all these years. A particularly large tree in front of the western wing of our building, about 40 years old, was cut down in minutes. On the large remaining tree stump, someone later wrote "Quercus--Tree of Tears--1972-2011" (a picture is attached as Exhibit 5A). I inquired and found out it was written by the fruit vendor who had worked under that tree for many months, a young man from Turkey who is a civil engineer getting a masters degree at City College, who had identified the type and age of the tree with the help of his brother, who is a forest engineer. A day later another neighbor wrote on the tree stump, "Gone With The Wind." (The tree stump was removed and thrown away two days ago by the MTA). (Other pictures of the tree stumps in front of the Yorkshire Towers, taken after the trees were cut down and before the tree stumps were also removed when the sidewalk was torn up, can be seen in Exhibits 5E and 5F.)

9.      Sometimes these things are unavoidable no matter how painful. But in this case, it was clearly avoidable, certainly at this time before our next hearing before this court on November 2. With the options being presented to this court in this expedited hearing, with the assistance of  our highly experienced experts (each with over 30 years of the highest level experience), a sense of practicality and decency by this large government agency, the MTA,

---

[continued from prior page] The failure of the MTA and the FTA to show any interest or haste for over three years in examining whether the largest building they were proposing to use for the Second Avenue Subway (our building) was structurally suitable, and the apparent failure of the MTA and the FTA to make even a rudimentary examination, during weeks of preparation, of the accuracy of their false statement about us in the FONSI, stands in sharp contrast to their sudden rush to destroy the trees and the sidewalk in front of our building.

should have made them avoid this action. Instead, their very first action after appearing before this court on September 26 was to take the only action that was irreparable and cut down the trees.

MTA Tears Up Sidewalk in Front Of Yorkshire Towers

10.     After removing the trees in front of our building, the next major action by the MTA was to tear up the sidewalk in front of our building. On Thursday, October 20, the MTA brought in major machinery and tore up and removed most of the sidewalk in front of the eastern third of our building.

11.     The next morning, Friday October 21, I wrote an urgent email to the MTA's Community Liaison (Claudia Wilson), asking why they were doing that in light of the discussions about this subject at the September 26 court hearing, and asked that they stop immediately, writing as follows: "Most important: We ask the MTA to direct Skanska [their contractor] to stop this heavy work immediately until after the court hearing to be held in 13 days [November 2], and the judge's decision, in light of the judge's statements at the last hearing about the obvious desirability of having the MTA's "heavy work" take place, if at all, after, and not before the resolution of the court hearing? Will the MTA do that, both in the spirit of the judge's comments, as well to avoid unnecessary disruption to our community and unnecessary expenditures if the court requires the restoration of the sidewalk?"

12.     On Monday morning, October 24, the MTA machinery came back and tore up and discarded most of the middle third of the sidewalk in front of our building, the part between the two driveways. On Monday evening, the MTA wrote back that their

5

work in front of our building "will not be halted by the MTA unless a court with jurisdiction orders such a stoppage." On Wednesday, October 26, the MTA tore up and discarded most of the remainder of the sidewalk, in front of the western wing of our building.

13.     What now remains, after the chopping down of the trees and the removal of most of the sidewalk, is a narrow walkway a few hundred feet long that is no wider than about 6 feet and 6 inches for our residents, and the many thousands who go past there, to walk through. Depending on the kind of construction materials and barriers that the MTA has placed there, we measured the available passageway yesterday as ranging from 6' 6" at its widest to 5 feet 1 inch at its narrowest.

14.     In addition, the various construction materials, fences, barriers and tight and narrow spaces have created some sight lines and conditions that make this a more dangerous place to walk or drive through as cars and people are passing by or coming in and out of the driveway. And this has destroyed the residential character of the area in front of our building, an area that has been an extension of the residential fabric of the over 2000 people to whom our building is home. This area is now one to be avoided or passed through as quickly as possible. (Some of these conditions can be seen in four photos, Exhibits 6A through 6E, that were taken when only the eastern third of the sidewalk had been torn up. Conditions have gotten worse since then as the rest of the sidewalk was torn up.)

15.     As with the tree removal, we fully understand that disruption at some level may come with necessary construction. But this should not happen, and be allowed to happen, unless absolutely necessary. And this was not necessary here, where an

expedited hearing is taking place before this court, where our highly qualified experts have provided detailed submissions explaining why this work is not necessary, and where the Court expressed some views on the difference between light work and "heavy work" (such as sidewalk removal) that the MTA was proposing to do.

16.     It appears clear that in the absence of a restraining order or a preliminary injunction the MTA rushed in to perform and accelerate not only light work but also major work, and not only major work but also irreparable work such as the chopping down of trees. They even started to destroy the sidewalk four days before the date they told the Court on September 26 they would do so when the Court asked when that would start.

17.     If we are correct, and we believe we are, in regard to all the new, detailed and highly relevant information that we have discovered in recent months through documents and drawings we have extracted from the MTA and the FTA (only after much effort and expense, and resistance), the work that the MTA rushed to perform in the past few days, as the very first part of a 37 month contract, was either unnecessary or, at a minimum, did not have to be performed at this time. Except unfortunately for the trees that were chopped down, the MTA's other work of the past few days can be stopped and restored. The continuing and unnecessary harm to our community should be stopped.

18.     The MTA has made it clear that in regard to the 86th Street station it will do everything possible to implement and accelerate its intent of building the entrances to this station (and only this station) midblock in front of our building, contrary to its own explicit Guidelines preferences (that we recently uncovered) for the location of station entrances at corners and contrary to its own explicit recognition of the safety hazards to

pedestrians resulting from locating entrances midblock. We therefore respectfully ask the

Court to issue a preliminary injunction so that the unnecessary work that the MTA is

intending to continue to do, and the harm that this will cause, will stop while the Court

has the opportunity to consider the detailed submissions we have made.


I declare under penalty of perjury that the foregoing is true and correct.
Executed on October 28, 2011.


_____
Doron Gopstein